[Crim. No. 13153. In Bank. Feb. 18, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
MILTON LUROS et al., Defendants and Respondents.

## COUNSEL

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood, Robert J. Lord and William E. McGinley, Deputy District Attorneys, for Plaintiff and Appellant.

Stanley Fleishman and Gerald J. Levie for Defendants and Respondents.

Paul N. Halvonik, Charles C. Marson, Jerome B. Falk, Jr., Coleman A. Blease, A. L. Wirin, Fred Okrand and Lawrence R. Sperber as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**SULLIVAN, J.**—Defendants, Milton Luros, Reuben Sturman, World Wide News and London Press, Inc., were indicted in June 1966 by the Grand Jury of Los Angeles County for conspiring to violate section 311.2 of the Penal Code[1] by wilfully preparing, publishing, printing and distributing four obscene books.[2] Defendants moved, pursuant to section 995, to have the indictment set aside. The trial court first denied the motion, but, after reconsideration, reversed its decision and set aside the indictment on the ground that the prosecution had failed to introduce any competent evidence of contemporary community standards by which the grand jury might be guided in determining whether there was probable cause to believe that defendants' books were obscene. The People appeal from the order setting aside the indictment.

At the grand jury proceedings in June 1966 the prosecutor introduced copies of the four allegedly obscene books, "Seed of the Beast," "Queer Daddy," "The Experimenters," and "Just for Kicks." He also introduced a fifth book, "Sex Life of a Cop," concerning which there had been established in other proceedings probable cause for the belief that it was obscene.[3] The grand jury read and presumably compared the four allegedly obscene books with "Sex Life of a Cop" to determine whether or not there was probable cause to believe the four books obscene. In introducing

---

[1] Hereafter, unless otherwise indicated, all section references are to the Penal Code.

[2] At the time of the offense section 311.2 provided: "Every person who knowingly: sends or causes to be sent, or brings or causes to be brought, into the state for sale or distribution, or in this state prepares, publishes, prints, exhibits, distributes, or offers to distribute, or has in his possession with intent to distribute or to exhibit or offer to distribute, any obscene matter is guilty of a misdemeanor." The recent amendment of the section is not relevant to the instant proceedings.

[3] We explain the introduction of this evidence, *infra.*

"Sex Life of a Cop," the prosecution relied on our holding in *Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 798 [13 Cal.Rptr. 415, 362 P.2d 47], that there was probable cause to believe such book obscene. The lower federal courts held the book to be in fact obscene. (*United States* v. *West Coast News Company* (6th Cir. 1966) 357 F.2d 855, 857, 858.) However, after the instant indictment was filed but before the trial court ruled on defendants' motion to set aside the indictment, the United States Supreme Court held that "Sex Life of a Cop" was not obscene. (*Aday* v. *United States* (1967) 388 U.S. 447 [18 L.Ed.2d 1309, 87 S.Ct. 2095].)

No evidence of contemporary community standards other than "Sex Life of a Cop" was introduced before the grand jury. After reading all five books, and considering evidence of defendants' involvement in the publication and distribution of the four books charged as obscene, the grand jury returned the instant indictment. In setting the indictment aside, the trial court recognized that its ruling was in conflict with the holdings in *Aday* v. *Superior Court, supra,* 55 Cal.2d 789, 798 and *People* v. *Aday* (1964) 226 Cal.App.2d 520, 531-532 [38 Cal.Rptr. 199], but was of the view that those cases had been overruled by more recent decisions. We conclude that those cases were correctly decided and have continued and undiminished vitality.

In *Aday* v. *Superior Court, supra,* 55 Cal.2d 789, we reviewed the validity of a search warrant which authorized seizure of two named books alleged to be obscene, as well as a wide variety of other books, records and objects. Although we there determined that the warrant was in certain respects unconstitutionally broad, we concluded that it was not invalid as a whole and we upheld that part of it which authorized the seizure of the named books constituting the principal basis of the charge of obscenity. (*Id.* at pp. 796-798.) The magistrate had read portions of the two named books before issuing the warrant, but had not received evidence as to contemporary community standards. We examined the books and held that there was probable cause to believe them obscene. After referring to the rule for determining obscene material announced in the *Roth* case (*Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304]), we said: "It should be emphasized that in applying these principles here we are concerned only with probable cause, not with the final determination as to the character of the named books or the guilt of petitioners. An examination of the two books convinces us there was probable cause for believing that they are obscene. Their text is such that an average person, applying contemporary community standards, could reasonably believe that their dominant theme appeals to a lascivious, shameful, and morbid interest in sex and that they are totally lacking in redeeming value, literary or otherwise. In view of their contents it was not necessary for [the magistrate] to . . .

receive evidence as to contemporary community standards in order to determine the issue of probable cause." (*Aday* v. *Superior Court, supra,* 55 Cal.2d at p. 798.)

We went on to say: "Where, as here, the seizure occurs under a warrant, an ex parte determination of the issue of obscenity, so far as probable cause is concerned, has taken place before issuance of the warrant, and immediately after the seizure a determination of the issue to that extent can be obtained in adversary proceedings by controverting the warrant under sections 1539 and 1540 of the Penal Code. In the event the owner is unsuccessful in that proceeding, a final determination as to obscenity will be had in the criminal action which will ordinarily follow within a reasonable time, or other remedies such as mandamus will be available to secure return of the property." (*Aday* v. *Superior Court, supra,* 55 Cal.2d at p. 799.)

Our holding in *Aday* v. *Superior Court, supra,* was followed three years later by the Court of Appeal in *People* v. *Aday, supra,* 226 Cal.App.2d 520. In that case, as in the case at bench, the defendant challenged an indictment because no evidence of contemporary community standards had been submitted to the grand jury.[4] The court there carefully set out both the standards and the procedures governing grand jury determination on the issue of whether there exists probable cause to believe material obscene: " 'The standard for judging obscenity adequate to withstand the charge of constitutional infirmity is whether to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to prurient interest.' (*In re Harris,* 56 Cal.2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305]; *Roth* v. *United States, supra,* 354 U.S. 476, at p. 489 [1 L.Ed.2d 1498, 1509, 77 S.Ct. 1304]; *Aday* v. *Superior Court, supra,* at p. 798.) Accordingly, it is a denial of due process for a trial court not to allow a defendant to prove contemporary community standards at his trial. (*In re Harris, supra,* at p. 880.) It is not necessary, however, that evidence of contemporary community standards be received on the issue of probable cause. (See *Aday* v. *Superior Court, supra,* at pp. 798-799.) A determination of obscenity may therefore be made by a grand jury, insofar as the issue of probable cause is concerned, without the

---

[4]In *People* v. *Aday, supra,* 226 Cal.App.2d 520, the defendants were charged by indictment with a violation of section 182, subdivision 1, namely, a conspiracy to violate section 311, subdivision 3, which then provided in pertinent part: "Every person who wilfully and lewdly. . . . 3. Writes, composes, stereotypes, prints, publishes, sells, distributes, keeps for sale, or exhibits any obscene or indecent writing, paper, or book . . . is guilty of a misdemeanor." (*Id.* at p. 525.) As previously pointed out (see text at fn. 2, *ante*) defendants in the instant case were charged by amended indictment with a violation of section 182, subdivision 1, namely, a conspiracy to violate section 311.2.

necessity of receiving evidence as to such standards." (226 Cal.App.2d at p. 531.) We denied a petition for a hearing.

In the nine and a half years since our decision in *Aday* v. *Superior Court* and the six and a half years since our denial of a hearing in *People* v. *Aday,* we have not overruled, disapproved or in any way qualified the rules as to the determination of probable cause in obscenity cases.[5] ■ The *Aday* cases retain their full vitality as precedents on this question and we conclude, to use our former language, that it is "not necessary . . . to . . . receive evidence as to contemporary community standards in order to determine the issue of probable cause." (55 Cal.2d at p. 798.) The failure to introduce evidence of contemporary community standards before the grand jury did not render the instant indictment defective.

Defendants contend, however, that even if an indictment is proper where no evidence of contemporary community standards is presented to the grand jury, the present indictment is invalid because "Sex Life of a Cop" was introduced as an example of obscenity under contemporary community standards. ■ They argue that since the United States Supreme Court later held that "Sex Life of a Cop" was *not* obscene (*Aday* v. *United States,* *supra,* 388 U.S. 447), the grand jury in this case was permitted and advised to use an erroneous example of contemporary community standards in determining the obscenity of the challenged book. However, the grand jury did not determine that the challenged books were in fact obscene, but only that there was probable cause to believe them obscene. While the United States Supreme Court subsequently held that "Sex Life of a Cop" is not, in fact, obscene, there is still, as we held in *Aday* v. *Superior Court,* *supra,* 55 Cal.2d 789, 798, probable cause to believe the book obscene. "Sex Life of a Cop" might have been an erroneous example of contemporary community standards if the grand jury had heard testimony that the book *was obscene* by those standards. But in this case the grand jury was not misled because the testimony[6] was only that the two *Aday* cases had held that there *was probable cause* to believe "Sex Life of a Cop" to be

---

[5]The concept of probable cause is approximately the same whether it is applied to determine the legality of a search warrant, or of an arrest without a warrant, or of a felony accusation. (*People* v. *Stout* (1967) 66 Cal.2d 184, 192-193 [57 Cal.Rptr. 152, 424 P.2d 704]; *People* v. *Aday, supra,* 226 Cal.App.2d 520, 532-533.)

[6]At the beginning of the grand jury proceedings, the deputy district attorney introduced two copies of the book "Sex Life of a Cop" which had previously been introduced in the criminal action of *People* v. *Haddad.* Later on Sergeant McPhee testified that in connection with his testimony in the *Haddad* case, he had compared one of the copies with the book "Sex Life of a Cop" involved in the *Aday* case in the Court of Appeal and found it to be the same book; that he had read the opinions of the Supreme Court and of the Court of Appeal in the *Aday* cases and noted that the courts in those cases held that there was probable cause for believing "Sex Life of a Cop" to be obscene.

obscene. Such testimony was and remains perfectly accurate and proper. Under the circumstances, we cannot see how the reading of the fifth book dealt a fatal blow to the otherwise valid accusation.[7]

Finally, we reach defendants' contention that the decision of the United States Supreme Court in *Stanley* v. *Georgia* (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243] requires a dismissal of the instant indictment. We summarize defendants' long and ingeniously concatenated argument: That *Stanley* held that the private possession of obscene matter cannot constitutionally be made a crime; that by its decision, the high court, "making significant changes in its concept of 'obscenity'," declared obscenity to be speech within the protection of the First Amendment; that no governmental regulation of speech within the First Amendment is valid unless there "is a clear showing that the burden placed upon exercise of freedom of speech is justified by a compelling state interest" which cannot be protected by means less burdensome to the exercise of First Amendment rights; that in *Stanley*, the court found only two compelling state interests which require regulation of obscenity—the state concern for minors and the state interest in preventing intrusions upon the sensibilities or privacy of an unwilling audience; that since under the holding in *Stanley* a person has a constitutional right to *possess* obscene material, it follows that any governmental limitation upon the *sale* or *distribution* of such material also contravenes First Amendment rights; and that accordingly, individuals "have the right to publish, prepare, print and sell such material without governmental intervention, except in cases where the material is intended for minors or is distributed in such a manner as to intrude upon the sensibilities or privacy of the general public unwilling to be exposed to such material."

Applying this interpretation to the case at bench, defendants urge that (a) since the indictment does not charge defendants with, and (b) the grand jury transcript is barren of any evidence establishing probable cause to believe that defendants participated in, distributing obscene material to minors or to unwilling persons in such a manner as to intrude upon their privacy or sensibilities,[8] the indictment must be set aside.

---

[7]Defendants initially raised several additional challenges to the validity of the instant indictment before the trial court. Because of that court's conclusions on the issues discussed above, it did not address itself to these supplemental points. Inasmuch as these contentions have been neither briefed nor argued before this court, we believe it would be inappropriate for us to pass on them at this time. On remand, the trial court will be able to address these arguments in the first instance.

[8]We note that several lower federal court decisions appear to support defendants' contention. (*Karalexis* v. *Byrne* (D.Mass. 1969) 306 F.Supp. 1363, probable jurisdiction noted (1970) 397 U.S. 985 [25 L.Ed.2d 394, 90 S.Ct. 1123]; restored to calendar for reargument (1970) 399 U.S. 922 [27 L.Ed.2d 184, 90 S.Ct. 2235]; *United States* v. *Thirty-Seven Photographs* (C.D. Cal. 1970) 309 F.Supp. 36, probable jurisdiction noted (1970) 400 U.S. 817 [27 L.Ed.2d 44, 91 S.Ct. 34]; *United States* v.

We believe that defendants' analysis of the *Stanley* rationale is incorrect, and that their contention based upon such analysis is without merit. In *Stanley,* officers investigating the defendant's bookmaking activities, obtained a search warrant for his home and entered pursuant thereto. They found little evidence of bookmaking but while looking through a desk in an upstair's bedroom found and seized reels of obscene films. The defendant was charged with and convicted of "knowingly having possession of . . . obscene matter" in violation of a Georgia statute. The Supreme Court of Georgia affirmed but the Supreme Court of the United States reversed holding that "the mere private possession of obscene matter cannot constitutionally be made a crime." (394 U.S. at p. 559 [22 L.Ed.2d at p. 546].) Such a state statute, the court held, constituted a drastic invasion of a person's right to receive information and his fundamental right to be free from "unwanted governmental intrusions into one's privacy." (394 U.S. at p. 564 [22 L.Ed.2d at p. 549].) It found no valid state interest[9] in prohibiting the private possession of obscenity and therefore held the statute unconstitutional as an unwarranted intrusion on First Amendment rights.

At each step in its reasoning, however, the high court in *Stanley* was careful to distinguish the problem of *commercial distribution* of obscenity, involved in *Roth* v. *United States, supra,* 354 U.S. 476, and in the instant case, from the problem of *private possession* of obscene material, involved in *Stanley*. The court recognized that *Roth* and the cases which followed it had found state interests in dealing with the problem of obscenity sufficient to justify regulation of commercial distribution of obscene matter. The court concluded that no such state interest justified the state regulation of private possession of obscenity, but it distinguished *Roth* because "that case dealt with public distribution of obscene materials and such distribution is subject to different objections." (394 U. S. at p. 567 [22 L.Ed.2d at p. 550].)

As *Stanley* recognized, a court, in deciding the constitutionality of a state regulation of obscenity must balance the state interests advanced by

*Lethe* (E.D.Cal. 1970) 312 F.Supp. 421; *United States* v. *Reidel* (C.D.Cal. 1970) unreported case, probable jurisdiction noted (1970) 400 U.S. 817 [27 L.Ed.2d 44, 91 S.Ct. 67]; *Hayse* v. *Van Hoomissen* (D.Ore. 1970) 321 F.Supp. 642; *United States* v. *Dellapia* (2d Cir. 1970) 433 F.2d 1252.) These decisions, of course, are not compelling authority for us (*In re Whitehorn* (1969) 1 Cal.3d 504, 511, fn. 2 [82 Cal.Rptr. 609, 462 P.2d 361]) and for the reasons stated hereafter, we disagree with any language in those cases which indicates that *Stanley* has impaired *Roth* v. *United States, supra,* 354 U.S. 476.

[9]The court rejected as insufficient the asserted state interests in protecting the reader's or viewer's mind from the harmful effects which obscenity might have, and in protecting against the aberrant sexual behavior which it is claimed results from private possession and use of obscene matter.

such regulation against the constitutional rights affected by it. No legitimate state interest justified the drastic invasion of constitutional rights incident to regulation of private possession of obscenity; therefore, such regulation is unconstitutional. But the Supreme Court noted that public distribution of obscenity presents different dangers and is subject to different objections which support state regulation of such distribution. The essence of the court's reasoning is found in the following language of the opinion: "Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." (*Stanley* v. *Georgia, supra,* 394 U.S. at p. 565 [22 L.Ed.2d at p. 549].) "Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." (*Id.* at p. 566 [22 L.Ed.2d at p. 550].)

Finally, as if to leave no doubt as to the extent of its holding, the high court concluded: "We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime. (Fn. omitted.] *Roth* and the cases following that decision are not impaired by today's holding. As we have said, the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home." (394 U.S. at p. 568 [22 L.Ed.2d at p. 551].)

We also find meritless defendants' argument that the holding in *Stanley* necessitates the conclusion that a state may not constitutionally regulate commercial distribution of obscene material because such regulation makes more difficult the full exercise of the right to possess obscenity privately. ■ The rights protected by the First and Fourteenth Amendments are not "absolutes" in the sense that where the constitutional protection exists it must prevail. (*Konigsberg* v. *State Bar* (1960) 366 U.S. 36, 49 [6 L.Ed.2d 105, 115, 81 S.Ct. 997]; *Breard* v. *City of Alexandria* (1951) 341 U.S. 622, 642 [95 L.Ed. 1233, 1248, 71 S.Ct. 920].) ■ As was said in *Breard:* "Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses. Rights other than those of the advocates are involved. By adjustment of rights, we can have both full liberty of expression and an orderly life." (*Id.*) ■ As we have discussed above, in the context of public distribution of obscenity, the balance of interests upholds the constitutionality of state regulation, even though that regulation imposes some burdens upon the exercise of constitutional rights.

Therefore, we find that *Stanley*, as the United States Supreme court expressly stated, does not impair *Roth* and the cases following it. States retain broad power to regulate obscenity and regulation of the public distribution of obscenity falls well within the broad scope of that power. ■ *Stanley* does not require that an indictment charging public distribution of obscenity also charge that the obscene matter was distributed to a child or unwilling audiences. We conclude that *Stanley* has no application to the instant case.

The order setting aside the indictment is reversed.

Wright, C. J., McComb, J., and Burke, J., concurred.

**TOBRINER, J.**—I dissent. In my opinion the broad constitutional rationale underlying the United States Supreme Court's recent obscenity decision of *Stanley* v. *Georgia* (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243], significantly alters prior obscenity doctrine and dictates that the dismissal of the present indictment be affirmed. I therefore find it unnecessary to reach the issue of whether affirmative evidence of contemporary community standards must be presented at grand jury proceedings.

It is no novel revelation that the passage of years since the United States Supreme Court first attempted a constitutional definition of obscenity in *Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304], has not produced a coalescence of judicial opinion but instead a multiplicity of standards.[1] Throughout this period, courts have struggled to find an accommodation between the constitutionally protected interest in free speech and the legitimate public interest in controlling activities which fall under the broad category of obscenity. In this process the judiciary, acknowledging that constitutional doctrine is still in the formative stage in this area,[2] has viewed the problem from different angles, seeking to find the position that best illuminates the proper reconciliation of the opposing forces at work here.

---

[1]Justice Harlan, dissenting in *Interstate Circuit* v. *Dallas* (1968) 390 U.S. 676, 705 fn. 1 [20 L.Ed.2d 225, 244, 88 S.Ct. 1298], noted that in 13 obscenity cases decided by the United States Supreme Court since *Roth*, there had been 55 separate opinions among the justices. Moreover, "[a] scholarly article has deduced from the spate of decisions in 1966 no less than 'five separate and contradictory tests.' Magrath, *The Obscenity Cases: Grapes of Roth*, 1966 Sup.Ct.Rev. 7, 56-57." (*United States* v. *A Motion Picture Film Entitled "I Am Curious-Yellow"* (2d Cir. 1968) 404 F.2d 196, 200 (Friendly, J., concurring).) "When ruling on obscenity, state and federal appellate benches do not split, they splinter." (R. Kuh, Foolish Figleaves? Pornography In—and Out of—Court (1967) p. 215.)

[2]Cf. *Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 200 [12 L.Ed.2d 793, 805, 84 S.Ct. 1676] (Warren, C. J., dissenting).

The opinion in *Stanley* v. *Georgia, supra,* 394 U.S. 557, by centering attention on the protection that is guaranteed the ultimate adult consumer of communicated ideas, reveals constitutional principles that I believe necessarily influence the judicial approach to the state regulation of obscenity at issue in the instant criminal proceeding. In *Stanley,* Justice Marshall, writing for a majority of five justices,[3] declared unconstitutional a state statute which made the possession of obscene material a crime, concluding that the defendant had a First Amendment right to possess and read or view in the privacy of his home all communicative materials "regardless of their social worth." Analysis of the rationale underlying this decision convinces me that our state and federal Constitutions compel a reexamination of the permissible scope of Penal Code section 311.2, regulating the preparation, publication, printing, and distribution of communicative material intended for the private use of adults.

In *Stanley,* the Supreme Court addressed for the first time a case of an adult defendant convicted of a crime because he possessed obscene films in his home. Led by these facts to examine the permissibility of governmental action in regulating the content of an adult's private library of books or films, the court concluded that the First Amendment demanded that the individual be free to choose what books he would read or what films he would view in the privacy of his home without fear of governmental sanction. The court reasoned: "It is now well established that the Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] . . . necessarily protects the right to receive. . . .' *Martin* v. *City of Struthers,* 319 U.S. 141, 143 (1943); see *Griswold* v. *Connecticut,* 381 U.S. 479, 482 (1965); *Lamont* v. *Postmaster General,* 381 U.S. 301, 307-308 (1965) (Brennan, J., concurring); cf. *Pierce* v. *Society of Sisters,* 268 U.S. 510 (1925). This right to receive information and ideas, regardless of their social worth, see *Winters* v. *New York,* 333 U.S. 507, 510 (1948), is fundamental to our free society. . . . If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." (394 U.S. at pp. 564-565 [22 L.Ed.2d at pp. 549-550].)

---

[3]There were no dissenters from Justice Marshall's opinion. Three justices (Stewart, J., Brennan, J., and White, J.) did not find it necessary to reach the constitutional questions faced by the majority, concluding that the evidence which formed the basis of the criminal prosecution was obtained through an unconstitutional search and seizure. Justice Black, in a separate concurrence, relied on his unvarying position that the states are completely without authority to proscribe obscenity in any form. The absence of a disagreement with the merits of the majority opinion is itself a significant occurrence in the obscenity area. (See fn. 2, *supra.*)

The People have suggested that this court has anticipated the broad holding of *Stanley* by its interpretation of Penal Code section 311.2 in *In re Klor* (1966) 64 Cal.2d 816 [51 Cal.Rptr. 903, 415 P.2d 791], and thus that *Stanley* works no substantial change in California law. In *Klor* we held that the mere preparation of obscene material was not a violation of section 311.2. In reaching that conclusion we reasoned in part: "Without the requirement that the defendant be shown to have prepared the material with intent to distribute it in its obscene form, [section 311.2] would apply to matter produced solely for the personal enjoyment of the creator or as a means for the improvement of his artistic techniques. Such a statute would approach an interdiction of individual expression in violation of the First and Fourteenth Amendments." (Fn. omitted.) (64 Cal.2d at p. 820.)

Our emphasis in *Klor,* however, was not on the individual's right to receive all written ideas in the privacy of his home, but rather on an individual's right to express ideas. Thus we concluded in *Klor:* "In summary, we do not believe that the Legislature intended to inhibit the mere preparation of allegedly obscene material not intended for distribution. We cannot believe that the Legislature meant to freeze the creative process and cast the maker's unfinished product into forbidden form during its genesis. Thus to stifle individual expression would be to shackle creativity itself." (64 Cal.2d at p. 822.) (See also *People* v. *Noroff* (1967) 67 Cal.2d 791, 793 fn. 4 [63 Cal.Rptr. 575, 433 P.2d 479].)

*Stanley,* in examining the right of an adult to possess all material, whether or not obscene, focuses on the individual as recipient of ideas, not creator. Nowhere in *Stanley* is there the slightest indication that the court saw its decision limited to material created by the possessor; indeed, the thrust of the whole opinion precludes such a construction. As the *Stanley* court viewed the interests before it, the defendant was "asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional need in the privacy of his own home. *He is asserting the right to be free from state inquiry into the contents of his library.*" (Italics added.) (394 U.S. at p. 565 [22 L.Ed.2d at p. 549].) It is these rights which *Stanley* determines are guaranteed to the individual by the Constitution; our decision in *Klor* was not so directed.

As the *Stanley* court emphasized, the question of the government's effective control of a man's own library involves the added dimension of an intrusion into the individual's private domain. In our highly complex and increasingly interdependent society the need to preserve the individual's freedom of thought has become crucial. The individual has been confronted with the rise of tremendous power in government and in the

so-called techno-structure that tends to compel conformity and standardization. The central issue of our time must be to preserve the identity of the individual in the face of a dangerous depersonalization and dehumanization. The censorship of the citizen's reading matter and the destruction of his access to reading matter, even though that censorship takes the form of prohibiting "pornography," inevitably spills over into censorship of political reading matter.[4] These are the compelling reasons why, in today's society, the individual's choice of the books he desires to read in private should be inviolate.

*Stanley* demonstrates that our constitutional protections secure to all persons this right of individual choice. So long as he does not invade the rights of others, the adult should be free not only to say whatever he wants and to advocate whatever he believes, but also to choose what books he will read or what films he will watch in his home. (See *Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901, 902 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) *Stanley* thus insures the preservation of a private domain where the individual is the complete master of what he reads and what he thinks. (See *Olmstead* v. *United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 48 S.Ct. 564] (Brandeis, J., dissenting); cf. *Rowan* v. *United States Post Office Dept.* (1970) 397 U.S. 728, 736-738 [25 L.Ed.2d 736, 742-744, 90 S.Ct. 1484]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]; *People* v. *Belous* (1969) 71 Cal.2d 954, 963-964 [80 Cal.Rptr. 354, 458 P.2d 194]; *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 268 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]; *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 [85 Cal.Rptr. 829, 467 P.2d 557].)

Although the *Stanley* court purported to work no fundamental changes in the constitutional rationale that underlay the general treatment of obscenity in *Roth* and the post-*Roth* obscenity cases, the basis of the *Stanley* opinion, as I understand it, necessarily modifies *Roth's* broad declaration that obscenity is not protected by the First Amendment.[5]

[4]Cf. *Barrows* v. *Municipal Court* (1970) 1 Cal.3d 821, 824 & fn. 4, fn. 7 [83 Cal.Rptr. 819, 464 P.2d 483], *infra.*

[5]In the past year and a half numerous federal courts have reached precisely the same conclusion in interpreting the *Stanley* decision. (*United States* v. *Dellapia* (2d Cir. 1970) 433 F.2d 1252, 1255 ("Where does *Stanley* locate the boundary between the government's right to control obscene matter deemed inimical to public order or the public morality and the right of individuals to keep to themselves? Is there a fundamental privilege to exchange and enjoy in private, letters, stories, books, movies —or spoken words—however sordid? After *Stanley* we do not see that we can answer these questions other than by a case by case accommodation of legitimate, competing interests."); *Hayse* v. *Van Hoomissen* (D.Ore. 1970) 321 F.Supp. 642, 644 ("It is no longer accurate to state categorically that the First Amendment does not protect obscenity. It is now necessary to inquire beyond the mere nature of the published matter, and to look into the government's interest in suppressing it."); *United States* v. *Various Articles of "Obscene" Merchandise* (S.D.N.Y. 1970) 315 F.Supp. 191, 195 (three judge court) ("The clear implication [of *Stanley*] is that orthodox First Amendment

Elaboration of the constitutional position of *Roth* in subsequent Supreme Court decisions reveals that at least several justices of the court felt that the prohibition of all obscene speech was reconcilable with the First Amendment because, by constitutional definition, matter was obscene only if it was *"utterly* without redeeming social importance."[6] Thus, before *Stanley,* the interest protected by the First Amendment seemed to be only the preservation of material having at least a modicum of social importance.

In *Stanley,* however, the court stated unequivocally that individuals enjoy a constitutional "right to receive information and ideas, *regardless of their social worth."* (Italics added.) (394 U.S. at p. 564 [22 L.Ed.2d at p. 549].) The *Stanley* court further elaborated its rejection of the limitation of First Amendment rights to matters having some "redeeming social importance": "Nor is it relevant that obscenity in general, or the particular films before the Court, are arguably devoid of any ideological content. *The line between the transmission of ideas and mere entertainment is much*

---

considerations are once again of paramount importance, *Roth* notwithstanding, even where the publications in issue are concededly 'obscene.' "); *United States* v. *Reidel* (C.D.Cal. 1970) (unreported decision) probable jurisdiction noted (1970) 400 U.S. 817 [27 L.Ed.2d 44, 91 S.Ct. 67] (docket No. 534); *United States* v. *Lethe* (E.D.Cal. 1970) 312 F.Supp. 421, 423-426; *United States* v. *Thirty-Seven Photographs* (C.D. Cal. 1970) 309 F.Supp. 36 (three-judge court); probable jurisdiction noted (1970) 400 U.S. 817 [27 L.Ed.2d 44, 91 S.Ct. 34] (docket No. 133); *Karalexis* v. *Byrne* (D.Mass. 1969) 306 F.Supp. 1363, 1366 (three-judge court, Aldrich, J.), probable jurisdiction noted, *Byrne* v. *Karalexis* (1970) 397 U.S. 985 [25 L.Ed.2d 394, 90 S.Ct. 1123], calendared for reargument (1970) 399 U.S. 922 [27 L.Ed.2d 184, 90 S.Ct. 2235] (docket No. 83) ("*Roth* cannot remain intact, for the Court there had announced that 'obscenity is not within the area of constitutionally protected speech or press' . . . whereas [the *Stanley* court] held that Stanley's interest was protected by the First Amendment, and that the fact that the film was 'devoid of any ideological content' was irrelevant"); *Stein* v. *Batchelor* (N.D.Tex. 1969) 300 F.Supp. 602, 606, probable jurisdiction noted, *Dyson* v. *Stein* (1969) 396 U.S. 954 [24 L.Ed.2d 419, 90 S.Ct. 428], calendared for reargument (1970) 399 U.S. 922 [26 L.Ed.2d 789, 90 S.Ct. 2230] (docket No. 41) ("It is impossible . . . for this Court to ignore the broader implications of the opinion which appears [*sic*] to reject or significantly modify the proposition stated in Roth . . . that 'obscenity is not within the area of constitutionally protected speech or press.' ").)

In addition, although legal writers are notorious for their general inability to agree, the host of legal commentators on the *Stanley* decision almost unanimously concur in this interpretation. (See Katz, *Privacy and Pornography,* 1969 Sup.Ct. Rev. 203; Engdahl, *Requiem for Roth: Obscenity Doctrine is Changing* (1969) 68 Mich.L.Rev. 185, 198-201; Note, *The Supreme Court, 1968 Term* (1969) 83 Harv.L.Rev. 7, 147-154; Note, *The New Metaphysics of the Law of Obscenity* (1969) 57 Cal.L.Rev. 1257; Note, *Stanley* v. *Georgia—A Private Look at Obscenity* (1969) 21 Baylor L.Rev. 503; 22 U.Fla.L.Rev. 138, 144; 7 San Diego L. Rev. 111, 118-119; cf. Gegan, *Twilight of Nonspeech* (1969) 15 Cath. Law. 210, 219.)

[6]*A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Massachusetts,* 383 U.S. 413, 419 [16 L.Ed.2d 1, 6, 86 S.Ct. 975] (Brennan, J., joined by Warren, C. J., and Fortas, J.); *Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 191 [12 L.Ed.2d 793, 798, 84 S.Ct. 1676] (Brennan, J., joined by Goldberg, J.).

*too elusive for this Court to draw, if indeed such a line can be drawn at all* See *Winters* v. *New York, supra,* 333 U.S. at 510." (Italics added.) (394 U.S. at p. 566 [22 L.Ed.2d at p. 550].)[7]

Although *Stanley* thus dictates that the government "has no business" in regulating the content of an adult's reading matter, the opinion expressly declares that the states retain the power to regulate the public dissemination of obscene material. (394 U.S. at pp. 563, 568 [22 L.Ed.2d at pp. 548, 551].) The People contend that this declaration demonstrates that Penal Code section 311.2 accords with *Stanley* since the section proscribes only the distribution of obscene material and the printing, preparation and publication of obscene material with the intent to distribute it.

The "power to regulate," however, does not encompass the authority to prohibit all means of distribution of material that is intended for the private use of adults. The rights of adults to possess, study, and enjoy all ideas in the privacy of their homes would mean little if the state could effectively foreclose all legal means of access to a designated category of material by penalizing anyone who distributed it. We should not be so disingenuous as to recognize, as we must, that our state and federal Constitutions protect an adult's right to possess all written material regardless of content, and simultaneously to acknowledge authority in the government to prohibit the dissemination of such material intended for private adult use solely because of that material's content.

The courts have long held that the right to disseminate material protected by the First Amendment is an integral and necessary part of that constitutional right. (*Martin* v. *City of Struthers* (1943) 319 U.S. 141, 143 [87 L.Ed. 1313, 1316-1317, 63 S.Ct. 862] ("This freedom [of speech and press] embraces the *right to distribute literature, Lovell* v. *Griffin,* 303 U.S. 444, 452, and necessarily protects the right to receive it."); *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 482 [14 L.Ed.2d 510, 513, 85 S.Ct. 1678] ("the right of freedom of speech and press includes *not only the right*

---

[7]The Supreme Court's candid recognition of the "too elusive" quality of the line separating allegedly "contentless" obscenity from "socially valuable" communication is particularly appropriate at this time when a "cultural revolution" in our society has illustrated the potential role of profane or "obscene" language as political expression. (See *Henley* v. *Wise* (N.D.Ind. 1969) 303 F.Supp. 62, 70.) In challenging the values and prevailing morality of American society, dissenters have often consciously cast off traditional linguistic shibboleths, not intending to appeal to anyone's "prurient interest," but rather attempting to shock their audience into reexamining and reevaluating commonly held norms. Although many may find the proposed reordering of morality personally offensive, and others may find the strategy utilized unwise or even counterproductive, the preservation of the right of free expression of all "political" views lies, of course, at the heart of the First Amendment. (See Kalven, *The New York Times Case: A Note on the "Central Meaning of the First Amendment,"* 1964 Sup.Ct.Rev. 191, 221.)

*to utter or to print, but the right to distribute,* the right to receive, the right to read") (italics added).) Moreover, "when expression protected by the First Amendment is involved 'It is of course no matter that the dissemination takes place under commercial auspices.' " (*Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 246 [49 Cal.Rptr. 537, 411 P.2d 289]; see *New York Times* v. *Sullivan* (1964) 376 U.S. 254, 265-266 [11 L.Ed.2d 686, 697-698, 84 S.Ct. 710]; *Smith* v. *California* (1959) 361 U.S. 147, 150 [4 L.Ed.2d 205, 209, 80 S.Ct. 215].)[8] The marketplace of ideas will surely be barren if all sellers are excluded. (Cf. *Lamont* v. *Postmaster General* (1965) 381 U.S. 301, 308 [14 L.Ed.2d 398, 403, 85 S.Ct. 1493] (Brennan, J., concurring).)

The constitutional interests involved in this criminal proceeding are thus broader than that of the defendant printer, publisher, or distributor (cf. *Interstate Circuit* v. *Dallas* (1968) 390 U.S. 676, 684 [20 L.Ed.2d 225, 232, 88 S.Ct. 1298]); they are the interests of every adult in realistically being able to exercise his constitutional right to decide which books he will read in the privacy of his home. *Stanley* commands that the individual, not the government, be the one who ultimately decides whether the individual will read a book or not; the state as effectively withdraws that individual choice by the criminal prosecution of all who print, publish or disseminate an "obscene" work as by the criminal prosecution of the reader himself. In either case the state eliminates from normal circulation those publications which are the subject of its censure. The alternative interpretation of *Stanley,* giving the state full authority to proscribe any dissemination of obscene matter, would effectively mean that the First Amendment protections apply only to an author's possession of his own works. I can find no indication in the Supreme Court decision that the First Amendment rights are to be so eviscerated.

Indeed, *Stanley* explicitly rejected as incompatible with the First Amendment the two main governmental purposes that have been proffered to support a general governmental prohibition of all distribution of such materials: (1) the governmental interest in protecting the morality of adults by controlling what reading materials they may legally obtain and (2) the governmental interest in curtailing potential criminal activity allegedly fostered by the reading of obscene matter.

---

[8]See also *Ginzburg* v. *United States* (1966) 383 U.S. 463, 474 [16 L.Ed.2d 31, 40, 86 S.Ct. 942] (Brennan, J.): "No weight is ascribed to the fact that petitioners have profited from the sale of publications which we have assumed . . . cannot themselves be judged obscene in the abstract; to sanction consideration of this fact might induce self-censorship, and offend the frequently stated principle that commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment." (Fn. omitted.)

The propriety of grounding governmental regulation of written and filmed expression on an asserted state interest in maintaining a certain standard of morality, an issue which created a great philosophical debate in the nineteenth century,[9] has recently become the subject of a dialogue between some of the leading legal theoreticians of our age.[10] In *Stanley,* the United States Supreme Court forthrightly declared that the state's exercise of control over morality by prescribing what materials can be read or observed by adults was incompatible with the First Amendment. ". . . Georgia asserts the right to protect the individual's mind from the effects of obscenity. We are not certain that this argument amounts to anything more than the assertion that the State has the right to control the moral content of a person's thoughts. To some, this may be a noble purpose, but it is wholly inconsistent with the philosophy of the First Amendment. As the Court said in *Kingsley International Pictures Corp.* v. *Regents,* 360 U.S. 684,688-689 (1959), '[t]his argument misconceives what it is that the Constitution protects. Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority. . . .' " (Fn. omitted.) (394 U.S. at pp. 565-566 [22 L.Ed.2d at p. 550].)[11] I cannot perceive how such a purpose of "control[ling] the moral content of a person's thoughts" is any more compatible with the First Amendment when used to justify the prohibition of distributing material intended for private use by adults than when used to justify the prohibition of reading or viewing such material.

The court similarly rejected the argument that would justify complete prohibition of dissemination on the grounds that exposure to such material might lead the adult recipients to antisocial conduct. While the court in *Roth* had not felt constrained to embrace this issue directly (see 354 U.S. at pp. 486-487 [1 L.Ed.2d at pp. 1507-1508]), the *Stanley* court did:

---

[9]See Mill, On Liberty (1859); Stephen, Liberty, Equality, Fraternity (1873).

[10]*Compare,* e.g., Hart, Law, Liberty, and Morality (1963) *with* Devlin, The Enforcement of Morals (1959), and Devlin, *Law, Democracy and Morality* (1962) 110 U.Pa.L.Rev. 635.

[11]In this regard Professor Herbert L. Packer has written: "The only valid purpose of obscenity law is to prevent public offense. It should be viewed, purely and simply, as the proscription of nuisance. People who do not wish to have erotic or other material that they find offensive foisted upon them are entitled to protection from it. . . . But it is hardly necessary in protecting that interest to forbid willing buyers and sellers to seek each other out. No one is forced to read *Fanny Hill,* or see a screening of *Un Chant d'Amour,* or attend a performance of *The Beard.* If to do so violates some moral or religious tenet that he holds important, he may keep the faith without requiring others, who do not share it, to follow suit." (Packer, The Limits of the Criminal Sanction (1968) p. 324.)

See also Henkin, *Morals and the Constitution: The Sin of Obscenity* (1963) 63 Cal. L.Rev. 391; Skolnick, *Coercion to Virtue: Enforcement of Morals* (1968) 41 So.Cal. L.Rev. 588.

". . . Georgia asserts that exposure to obscenity may lead to deviant sexual behavior or crimes of sexual violence. There appears to be little empirical basis for that assertion. But more important, if the State is only concerned about literature inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that '[a]mong free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law. . . .' *Whitney* v. *California,* 274 U.S. 357, 378 (1927) (Brandeis, J., concurring.) See Emerson, *Toward a General Theory of the First Amendment,* 72 Yale L.J. 877, 938 (1963). Given the present state of knowledge, the State may no more prohibit mere possession of obscenity on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they may lead to the manufacture of homemade spirits." (Fn. omitted.) (394 U.S. at pp. 566-567 [22 L.Ed.2d at pp. 550-551].)

Although the constitutional right of adults to possess material, whatever its worth, thus necessarily means that government may not completely prohibit the dissemination of material intended for an adult's private use, *Stanley* makes it perfectly clear that the state retains authority to regulate the manner of public dissemination[12] in furtherance of two legitimate governmental objectives. The Supreme Court, drawing from its experience garnered in previous obscenity cases, isolated two state objectives that are permissible bases for the regulation of public distribution of obscene material: (1) the protection of an unwilling individual from blatant and offensive assaults on his sensibilities and (2) the protection of children. (394 U.S. at p. 567 [22 L.Ed.2d at p. 550].)[13]

---

[12]Cf. Brennan, *The Supreme Court and the Meiklejohn Interpretation of the First Amendment* (1965) 79 Harv.L.Rev. 1, 5.

[13]The identification of these two purposes as legitimate forms of state regulation has emerged gradually in the opinions of many of the Supreme Court justices over the past 12 years. Perhaps Chief Justice Warren, concurring in *Roth* v. *United States* (1957) 354 U.S. 476, 495 [1 L.Ed.2d 1498, 1513, 77 S.Ct. 1304], laid the foundation for the approach to obscenity problems embraced in *Stanley* when he wrote: "It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. . . . A wholly different result might be reached in a different setting." (P. 495 [1 L.Ed.2d p. 1513].)

The initial articulation of the legitimate state interest in protecting the sensibilities of the public from offensive assaults also appeared in *Roth.* Justice Harlan, in his concurring and dissenting opinion, proposed that: "the State has a legitimate interest in protecting the privacy of the home against invasions of *unsolicited* obscenity." (Italics added.) (354 U.S. at p. 502 [1 L.Ed.2d at pp. 1516-1517].) This concern with interferences with the privacy of the public is apparent throughout the entire opinion of Justice Brennan, joined by Chief Justice Warren and Justices Clark, White, and Fortas, in *Ginzburg* v. *United States* (1966) 383 U.S. 463, 469-470 [16 L.Ed. 2d 31, 37-38, 86 S.Ct. 942]. In concluding that the defendant's "pandering" could properly be taken into account in an obscenity case, the court expressed concern with the "brazen" public dissemination of offensive material (383 U.S. at p. 470 [16 L.Ed.2d at p. 38]), the "indiscriminate . . . solicitation" (*id.* at p. 469 [16 L.Ed.2d

The People contend that since any public dissemination of obscene material presents the danger that public sensibilities may be assaulted or that children may obtain the books, the state is justified, in furtherance of these objectives, in proscribing *all* public distribution. This court, however, has long recognized that when the state regulates in the area of First Amendment rights "[p]recision of regulation is required so that the exercise of our most precious freedoms will not be unduly curtailed except to the extent necessitated by the legitimate governmental objective." (*Vogel*

at p. 37]), and the "flooded mails" (*id.* at p. 473 [16 L.Ed.2d at p. 39]). As the court explicitly noted, "[P]ublic confrontation with the potentially offensive aspects of the work . . . heightens the offensiveness of the publications to those who are offended by such material." (*Id.* at p. 470 [16 L.Ed.2d at p. 38].) (See Note, *More Ado About Dirty Books* (1966) 75 Yale L.J. 1364, 1404 fn. 156.)

Justice Stewart explained the legal rationale for such concern more fully two years later, in his concurring opinion in *Ginsberg* v. *New York* (1968) 390 U.S. 629, 649 [20 L.Ed.2d 195, 209, 88 S.Ct. 1274]: "When expression occurs in a setting where the capacity to make a choice is absent, government regulation of that expression may co-exist with and even implement First Amendment guarantees. So it was that this Court sustained a city ordinance prohibiting people from imposing their opinions on others 'by way of sound trucks with loud and raucous noises on city streets.' [*Kovacs* v. *Cooper*, 336 U.S. 77, 86.] And so it was that my Brothers Black and Douglas thought that the First Amendment itself protects a person from foisting his uninvited views upon the members of a captive audience. [*Public Utilities Comm.* v. *Pollak*, 343 U.S. 451, 466 (Black, J., dissenting), 467 (Douglas, J., dissenting)]."

The court's very recent unanimous decision in *Rowan* v. *United States Post Office Dept.* (1970) 397 U.S. 728 [25 L.Ed.2d 736, 90 S.Ct. 1484], upholding a federal statute permitting a householder to insulate himself from mailed advertisements he finds "erotically arousing or sexually provocative," represents the full crystallization of this concern for protection from unsolicited and undesired "psychic" affronts.

The state interest in protecting its children from obscenity has similarly emerged in a number of obscenity decisions. In *Jacobellis* v. *Ohio* (1964) 378 U.S. 184 [12 L.Ed.2d 793, 84 S.Ct. 1676], Justice Brennan, joined in concurrence by Justice Goldberg, stated forthrightly: "We recognize the legitimate and indeed exigent interest of states and localities throughout the nation in preventing the dissemination of material deemed harmful to children. . . . State and local authorities might well consider whether their objectives in this area would be better served by laws aimed specifically at preventing distribution of objectionable material to children, rather than at totally prohibiting its dissemination." (Fn. omitted.) In a separate opinion in *Jacobellis* Chief Justice Warren suggested: "A technical or legal treatise on pornography may well be inoffensive under most circumstances but, at the same time, 'obscene' in the extreme when sold or displayed to children." (Fn. omitted.) (378 U.S. at p. 201 [12 L.Ed.2d at p. 806].)

In *Ginsberg* v. *New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274], Justice Brennan, writing for six members of the court, upheld the constitutionality of a special statute directed at the sale of 'obscene' material to minors. The court concluded that it was constitutionally permissible for a state to prohibit the dissemination of certain material to minors, even though a general prohibition on such dissemination would have violated the First Amendment. Justice Stewart, in his concurrence quoted in part above, found state regulation of obscenity for the protection of children analogous to the permissible regulation to prevent offensive "psychic" assaults on a captive public. Viewing the still maturing minor as not fully capable of exercising a non-coerced, informed, individual choice, Justice Stewart reasoned that in both situations the government was acting to preserve the promise of free choice implicit in the

v. *County of Los Angeles* (1967) 68 Cal.2d 18, 22 [64 Cal.Rptr. 409, 434 P.2d 961].) As the United States Supreme Court has explained, "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (Fn. omitted.) (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247].) Indeed, the reasoning underlying the People's contention was rejected long ago by the United States Supreme Court in *Butler* v. *Michigan* (1957) 352 U.S. 380 [1 L.Ed.2d 412, 77 S.Ct. 524], in which case the court overturned a state obscenity statute that prohibited the dissemination of First Amendment protected material that the state felt was unfit for its children. In *Butler,* Justice Frankfurter, writing for a unanimous court, declared: "The State insists that, by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. Surely this is to burn the house to roast the pig. . . . We have before us legislation not reasonably restricted to the evil with which it is said to deal. The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children." (352 U.S. at p. 383 [1 L.Ed.2d at p. 414].)

Although California's criminal statute differs from the Michigan law in that its obscenity standard is ostensibly geared to adults, not children, *Stanley* holds that, as far as government regulation is concerned, no book is "too rugged for grown men and women" to read in the privacy of their

---

First Amendment. (390 U.S. at p. 649 [20 L.Ed.2d at p. 209].)

In *Redrup* v. *New York* (1967) 386 U.S. 767, 769 [18 L.Ed.2d 515, 517, 87 S.Ct. 1414], before listing the various standards of obscenity espoused by the individual justices, the court expressly noted: "In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See *Prince* v. *Massachusetts*, 321 U.S. 158; cf. *Butler* v. *State of Michigan*, 352 U.S. 380. In none was there any suggestion of an assault upon individual privacy in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. *Breard* v. *City of Alexandra*, 341 U.S. 622. . . . And in none was there evidence of the sort of pandering which the court found significant in *Ginzburg* v. *United States*, 383 U.S. 463."

Prior to *Stanley,* two federal cases interpreted this paragraph in *Redrup* as limiting the obscenity inquiry to interference with the various interests expressly designated. The courts dismissed the cases before them because there was no evidence that any of the "special circumstances" designated in *Redrup* were present. (*United States* v. *127,295 Copies of Magazine* (D.Md. 1968) 295 F.Supp. 1186 (two-judge court); *United States* v. *4400 Copies of Magazine* (D.Md. 1967) 276 F.Supp. 902 (en banc).) See also *Grant* v. *United States* (9th Cir. 1967)) 380 F.2d 748, 749 fn.*)

As I understand it, the state interest in preventing "pandering" is substantially equivalent to its interest in prohibiting other offensive public displays or exhibitions which are foisted on unwilling individuals. Insofar as the "pandering" concept represents an independent element relevant to a decision of whether material is obscene or not, the approach in *Stanley* obviates the importance of the concept in cases involving material intended for the private use of adults. Thus, the *Stanley* court significantly noted only two general state interests and did not mention "pandering" at all.

home. *Butler* teaches that a general proscription of reading matter cannot be countenanced by the state's concededly legitimate interest in protecting children. Thus California's contention here that all dissemination can be curtailed should be rejected. Similarly, I can perceive no reason why the state's interest in protecting the privacy and sensibilities of the public could justify a general proscription of *all* manner of distribution, including that which does not offend. The evils of the corruption of children and of obnoxious and offensive displays should be met directly and precisely.

Thus, as I read *Stanley,* the governmental authority to regulate the public distribution of reading material intended for the private use of adults extends only to measures reasonably related to the protection of juveniles or to the protection of the privacy of individuals from unsolicited assaults on their sensibilities.[14] These limits do not leave the state without means to combat the very real evils that may arise as to these matters, but instead require the state to focus upon them and to provide criminal sanctions directed to such evils. The prohibition of intolerably obnoxious advertising campaigns that reach individuals unsolicited certainly falls within such permissible goals of state laws. (See *Rowan* v. *United States Post Office Dept.* (1970) 397 U.S. 728, 736-738 [25 L.Ed.2d 736, 742-744, 90 S.Ct. 1484]; cf. *Ginzburg* v. *United States* (1966) 383 U.S. 463 [16 L.Ed.2d 31, 86 S.Ct. 942]; *United States* v. *Klaw* (2d Cir. 1965) 350 F.2d 155, 163-164.) Further, the state may proscribe the display of patently offensive posters, billboards, and book covers[15] in public areas where indi-

---

[14]In this regard, the general conclusions reached recently by the Presidential Commission on Obscenity and Pornography are particularly pertinent. The Commission concluded: "In general outline, the Commission recommends that federal, state, and local legislation should not seek to interfere with the right of adults who wish to do so to read, obtain, or view explicit sexual materials. On the other hand, we recommend legislative regulations upon the sale of sexual materials to young persons who do not have the consent of their parents, and we also recommend legislation to protect persons from having sexual materials thrust upon them without their consent through the mails or through open public display." (The Report of the Commission on Obscenity and Pornography, p. 57 (Bantam Edition, 1970).) See also, Krislov, *From Ginzburg to Ginsberg: The Unhurried Children's Hour in Obscenity Litigation,* 1968 Sup. Ct.Rev. 153, 193-194; Emerson, *Toward a General Theory of the First Amendment* (1963) 72 Yale L.J. 877, 938-939; Packer, Limits of the Criminal Sanction, pp. 324-325.

[15]The fact that a book uses the word "pornography" or "obscene" on the cover should not, in itself, be enough to make the cover offensive, for such a label in effect gives warning that may prevent an undesired psychic assault. The use of pictorial aids to illustrate the contents of such "rugged" books, however, may be such as to offend the average member of the unwilling public, and such illustration could be proscribed (see *City of Youngstown* v. *DeLoreto* (1969) 19 Ohio App.2d 267 [251 N.E.2d 491, 504-505]); only the display of the offensive book cover, however, would be subject to the proscription. Dissemination which does not display the cover, or distribution of the book within a different, nonoffensive cover, would be protected.

viduals, unwilling to be confronted with such material, cannot avoid them. (Cf. *People* v. *Stover* (1963) 12 N.Y.2d 462 [240 N.Y.S.2d 734, 191 N.E.2d 272] (Fuld, J.).) Similarly, the state may enact legislation that seeks to protect juveniles by prohibiting the sale of certain harmful matter to them (see *Ginsberg* v. *New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274]); indeed, the California Legislature has recently approved such a statute (Pen. Code, § 313).[16]

Given the above constitutional considerations, I believe that the indictments in the instant case, charging defendants with conspiring to violate Penal Code section 311.2 by preparing, publishing, printing, and distributing obscene books, material intended for the private use of adults, is constitutionally infirm. Although section 311.2 also prescribes criminal sanctions for individuals who "exhibit" obscene matter, sanctions which under proper circumstances would be compatible with one of the legitimate governmental objectives set out above, the present indictment includes no reference to any exhibition of such materials by the defendants. Nor was any evidence presented to the grand jury which returned the indictment that would warrant such a charge. Under these circumstances, I conclude that the indictment should be dismissed. (See, e.g., *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713].)

This approach to the regulation of obscenity, necessitated by the rationale of *Stanley,* concededly would work a substantial change in the relevant legal aspects of this area. From the standpoint of the administration of the judicial task, however, such a change would surely be welcome. The past efforts of the courts, and especially the United States Supreme Court, have largely centered on attempts to define constitutionally unprotected obscenity; the task has proven to be Herculean and almost unachievable. Judicial fear of the potential erosion of the definition has necessitated that each level of appellate courts independently review the challenged material[17] in terms of this elusive,[18] nonuniform, concededly subjective definition, an undertaking not only personally distasteful for most judges and enormously time-consuming for all, but one which is essentially non-legal, for the determination of "social worth" cannot be reached by resort to precedent or rational principles.

---

[16]Of course, I intimate no opinion on the constitutionality of the newly enacted statute, but only indicate that the philosophy of such regulation generally does not conflict with the state and federal Constitutions.

[17]See, e.g., *Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 189-190 [12 L.Ed.2d 793, 798-799, 84 S.Ct. 1676] (opinion of Brennan, J.); *Roth* v. *United States* (1957) 354 U.S. 476, 498 [1 L.Ed.2d 1498, 1514, 77 S.Ct. 1304] (opinion of Harlan, J.).

[18]"In toto, applying the law to specific questioned materials has been a labor as frustratingly impossible as is nailing custard pies to trees." (Kuh, Foolish Figleaves? Pornography In—And Out of—Court (1967) p. 215.)

*Stanley's* illumination of the permissible fields of governmental regulation would serve to extricate the judiciary from the legal quagmire of obscenity. When materials intended for private individual use are in question, law enforcement officials, courts, and private individuals would no longer be faced with the necessity of performing the nearly impossible process of framing an abstract definition.[19] Instead, legislative regulations and judicial interpretations could focus upon the defined harms of offensive psychic assaults and the corruption of children.[20] This approach would enable judges and lawyers to step back from merely subjective responses and return to reasoned analysis.[21]

To be sure, this reevaluation of legitimate state purposes would not obviate all problems in the field of obscenity. Courts would be obligated to continue to scrutinize regulations directed at fulfilling the above stated goals since they border on constitutionally protected areas. (See, e.g., *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 66 [9 L.Ed.2d 584, 590, 83 S.Ct. 631].) The regulation of material not covered by the rationale of *Stanley* would still necessarily be judged by present constitutional standards of obscenity. Nonetheless, the judicial task would undoubtedly be lightened by the refocusing of a substantial proportion of obscenity litigation.

My conclusion, however, does not emanate merely from a desire to relieve the judiciary of an unpleasant task. It is instead the recognition of one principle of our governmental system, a principle articulated by Justice Brandeis over 40 years ago: "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man." (*Olmstead* v. *United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 956,

---

[19]*Ginzburg* v. *United States* (1966) 383 U.S. 463, 480-481 [16 L.Ed.2d 31, 43-44, 86 S.Ct. 942] (Black, J., dissenting), "[N]ot even the most learned judge much less a layman is capable of knowing in advance of an ultimate decision in his particular case by this Court whether certain material comes within the area of 'obscenity' as that term is confused by the Court today."

[20]"Under a nuisance approach law enforcement officers would no longer have a roving commission to stamp out the unorthodox and the avant garde. Their job would be solely to keep the more obvious forms of public display under control. It would be the difference between a defensive and an aggressive war." (Packer, The Limits of the Criminal Sanction, p. 325.)

[21]See Note, *supra*, 75 Yale L.J. 1364, fn. 19, at p. 1404.

48 S.Ct. 564] (Brandeis, J., dissenting).) The exercise of governmental authority effectively to prevent an adult from obtaining written material to be read in his home is incompatible with the protection of free speech guaranteed by our state and federal Constitutions.

I would affirm the dismissal of the indictment.

Peters, J., and Mosk, J., concurred.