[No. H012841. Sixth Dist. Nov. 30, 1995.]

MICHAEL JOHN HAGEN, Plaintiff and Appellant, v.
TERRY HICKENBOTTOM, Individually and as Trustee, etc., Defendant
and Respondent.

**COUNSEL**

James Cameron for Plaintiff and Appellant.

Baskin, Grant & Joseph, David Green Baskin and Dennis B. Lippitt for Defendant and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, J.**—Mayme I. Hagen died in 1991, at the age of 96. Her two grandchildren, Michael and Amy Hagen, were her only surviving issue; her only child, John Hagen (the grandchildren's father) had died in 1980. In 1988 the decedent had executed a revocable living trust, supplemented by a pour-over will, which gave almost all of her property to her cousin, Terry Hickenbottom, upon the death of the decedent. After the decedent died the grandchildren brought this action against Hickenbottom, individually and as trustee of the 1988 trust, to set aside the trust upon the theory that Hickenbottom had exercised undue influence over the decedent, and for damages. The trial court granted Hickenbottom's motion for summary judgment, and entered a judgment awarding costs to Hickenbottom. The grandson, Michael Hagen, alone appeals; because the granddaughter, Amy Hagen, has not appealed, the judgment against her is final for all purposes.

Review of a summary judgment involves pure questions of law—the legal significance of the documents upon which the trial court acted—which we review independently. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1513-1515 [285 Cal.Rptr. 385]; *Parsons Manufacturing Corp.* v. *Superior Court* (1984) 156 Cal.App.3d 1151, 1156 [203 Cal.Rptr. 419].) Although the record suggests the grandson's case is weak we shall conclude, within the scope of the issues the parties have chosen to frame on appeal, that the trial court should not have granted summary judgment against the grandson. Accordingly we shall reverse the judgment against the grandson with directions.

The pleadings define the issues to which a summary judgment motion may, or need, be directed. (*Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 536 [249 Cal.Rptr. 5]; cf. *Wood* v. *Riverside General Hospital* (1994) 25 Cal.App.4th 1113, 1119 [31 Cal.Rptr.2d 8].) The factual premise of the grandchildren's first amended complaint was their assertion that Hickenbottom, by conduct and statements, unduly influenced the decedent's decision to leave almost none of her estate to the grandchildren, by persuading the decedent to execute the 1988 trust and by thereafter taking steps to reduce the possibility that the decedent would change her mind. The grandchildren sought relief for the undue influence on three theories which they undertook to state in separate counts.

The first count sought the traditional and essentially equitable remedy of annulment of the disposition of the decedent's assets. In support of a prayer for a declaration that the trust was "the result of undue influence and lack of

capacity" and was "null and void in its entirety," the grandchildren alleged that they were the decedent's sole heirs and until 1988 had been her sole beneficiaries, that in 1988 Hickenbottom "began to exert undue influence over [the decedent], who was then over 90 years old and susceptible to undue influence by reason of age, infirmity and lack of capacity," that Hickenbottom gained control over the decedent's "personal, business, and financial affairs," induced her "to sever and discontinue relations" with the grandchildren, moved her from Santa Barbara to Santa Cruz where Hickenbottom lived, and caused her to execute the 1988 trust "pursuant to the terms of which [the grandchildren] received nothing from the estate of [the decedent], the provisions of which are unnatural, and which vary from [the decedent's] prior expressed intentions. [Hickenbottom] maintained a confidential relationship with [the decedent], [was] active in the preparation of the trust, and unduly profited by its terms."

The grandchildren's second and third counts undertook to state tort claims for damages, but again the theories were based on the factual premise that Hickenbottom had unduly influenced the decedent.

The second count suggested a theory—recognized in several states but not previously validated in California—of intentional interference with an expected inheritance or gift. (Cf. generally, Annot., Liability in Damages for Interference with Expected Inheritance or Gift (1983) 22 A.L.R.4th 1229; Rest.2d Torts, § 774B, com. b, p. 58.) The count incorporated the allegations of the first count and added allegations that from 1980 to 1988 the grandson had been designated the sole beneficiary of the decedent's testamentary trust with assets of a value (after the decedent's death) in excess of $400,000, that from 1980 until the decedent died Hickenbottom "wrongfully and intentionally engaged in conduct in which she interfered with the relationship between [the grandchildren] and their grandmother, [the decedent], which caused decedent to create a revocable trust which excluded [the grandchildren] as beneficiaries," that over the same period Hickenbottom "knowingly, wrongfully and intentionally made statements to decedent which caused decedent to disinherit [the grandchildren]," that Hickenbottom's conduct and statements were "for the purpose of depriving [the grandchildren] of the testamentary gift which decedent had previously made and to obtain that gift exclusively for herself," that as a result the decedent "did disinherit her grandchildren" who were therefore entitled to recover compensatory and punitive damages.

The third count evoked an analogy to California's tort of negligent interference with prospective economic advantage (cf. *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803-808 [157 Cal.Rptr. 407, 598 P.2d 60]). The

count incorporated the allegations of the first count and the compensatory-damages allegations of the second count and added an allegation that Hickenbottom "negligently engaged in conduct in which she interfered with the relationship between [the grandchildren] and their grandmother, [the decedent], and which she knew or should have known would cause decedent to create a revocable trust which substantially excluded [the grandchildren] as beneficiaries."

In this court Hickenbottom points out that the grandchildren's pleading did not mention the pour-over will, complementary to the trust and executed on the same day, which provided among other things that if the trust were to fail or be revoked virtually all of the decedent's estate would nevertheless pass to the trustee to be administered as provided in the trust instrument. In our view the omission is obviously an oversight which the grandchildren undoubtedly would have sought to remedy had the point been timely raised in the trial court. Therefore we shall reject Hickenbottom's argument that the omission moots the attack upon the trust as such, and shall treat the grandchildren's theories as though addressed to both the trust and the pour-over will.

Hickenbottom moved for summary judgment or summary adjudication on multiple grounds, of which only her assertion that all of the grandchildren's theories were "barred" by a privilege to speak the truth (or "defense of truth") is relevant to the issues the parties have framed on appeal.

A defendant is entitled to summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the [defendant] is entitled to a judgment as a matter of law" because "the action has no merit." (Code Civ. Proc., § 437c, subds. (c), (a).) In 1993, when Hickenbottom's motion was made, heard, and ruled on, Hickenbottom's burden in support of her motion was to show "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action." (Code Civ. Proc., § 437c, former subd. (n)(2); Stats. 1992, ch. 1348, § 1.)

To bear her burden Hickenbottom submitted excerpts from transcripts of the depositions of the grandchildren, of their mother Maureen Hagen (who had been divorced from John Hagen in 1974), and of one of the decedent's physicians, and copies of three letters—two from Maureen Hagen to the decedent and one from Maureen Hagen to Hickenbottom—which had been marked as deposition exhibits.

The grandchildren interposed evidentiary objections to many of the facts reflected in Hickenbottom's showing, and several of these objections were discussed at hearing on Hickenbottom's motion, but we find no indication in the record that the trial court ever formally ruled on any of the objections. Accordingly all the evidence Hickenbottom submitted was available for the trial court's consideration (Code Civ. Proc., § 437c, subd. (c)) and is available for ours.

Hickenbottom showed, directly or by rational inference, the following facts pertinent to the issues before us:

The granddaughter had been adopted by John and Maureen Hagen. Sometime before 1982, the decedent omitted the granddaughter from her will, apparently because the granddaughter was not her natural issue, and the decedent did not thereafter make significant provision for the granddaughter.

The grandson graduated from high school in the spring of 1987. During his senior year in high school he became involved with drugs; in August 1987, following his graduation, he sought treatment in a rehabilitation program. Also during his senior year in high school the grandson impregnated his girlfriend and then paid for her to have an abortion. The grandson and the decedent were both Catholic, and although the grandson considered himself close to the decedent he did not want the decedent to know about the abortion because "[i]t would place a negative impression of me . . . in her mind." He was concerned that the decedent would "not be . . . forgiving . . . ." He "didn't find what was the use of my grandmother knowing. And I felt it would be very harmful to my grandmother . . . to know of that issue." Nor did the grandson tell the decedent about the drug rehabilitation program; he explained that "it was a very confidential issue. I didn't feel she —it wouldn't—I didn't want to tell her, tell your grandmother." In September 1989 the grandson called Hickenbottom who told him that "my grandmother was disappointed in me because I was using drugs"; Hickenbottom acknowledged to the grandson that Hickenbottom had told the decedent about the 1987 drug episode, because (according to the grandson) Hickenbottom "felt my grandmother needed to know." The grandson assumed that Hickenbottom had also told the decedent about the abortion.

In this same September 1989 conversation Hickenbottom made statements which led the grandson to believe that the decedent's estate would go to Hickenbottom rather than to the grandson.

The granddaughter did not believe that Hickenbottom lied to the decedent about "the adoption issue," and she acknowledged that the decedent had

known the granddaughter was adopted "without having to be told . . . ." The grandson could not say that Hickenbottom had told the decedent anything that was not true about the abortion, and the granddaughter testified that she did not believe Hickenbottom lied to the decedent about the grandson's drug rehabilitation program. Maureen Hagen testified that it was not her opinion that Hickenbottom "harbored an evil or malicious intent toward" the grandchildren.

Dr. White testified he had not noticed a deterioration in the decedent's mental skills or capacity up to the month, March 1988, in which she executed the trust and pour-over will. The granddaughter never observed the decedent "being weak of mind or unable to make decisions, unable to speak her mind, anything like that."

In early September 1989, some 18 months after the decedent executed the trust and pour-over will, Hickenbottom moved the decedent from her long-time home in Santa Barbara to an apartment in Santa Cruz near where Hickenbottom lived and worked.

Hickenbottom had visited the decedent, in Santa Barbara, since 1979 or 1980, and at some point the decedent had given Hickenbottom her power of attorney. The granddaughter testified that beginning shortly before the decedent moved to Santa Cruz the granddaughter had "started having . . . feelings of wrongdoing" based on "[t]he frequency of [Hickenbottom's] visits to [the decedent]" and "the couple times that I had called and [Hickenbottom], perhaps, was evasive in letting me talk to my grandmother" in that "[t]here were times when I called my grandmother, and for some reason or excuse I was unable to talk to her."

Dr. White's notes reflected that in August 1989 he had seen the decedent for complaints of back pain, and it appeared that the decedent had not been taking her medication on a regular basis; there had also been a complaint of incontinence. According to Dr. White he had spoken by telephone with Hickenbottom, who was " '[c]oncerned that patient's health is deteriorating, and that she is no longer able to care for her own needs' " and who " '[w]ould like to have patient closer to her.' " Dr. White recommended that the decedent "find a place near [Hickenbottom] . . . for . . . closer supervision." Dr. White "vaguely" recalled that the proposed move "was amenable to" the decedent. Dr. White recalled that the decedent "had, in the past, voiced reluctance to leave her apartment [in Santa Barbara], but it was becoming clear that some type of daily supervision . . . was essential." He testified that "I don't think that her judgment was as acute or intact, at that point, as it had been in the past."

The grandchildren and Maureen Hagen learned of the proposed move before they learned of the 1988 trust and pour-over will. All three met with the decedent before she moved. Maureen Hagen called Dr. White, expressing concern that the decedent "is being moved against her will to an unfamiliar environment"; Dr. White "[a]ssured" Maureen Hagen that the decedent "was not doing well on her own, and that she requires closer supervision," and suggested that Maureen Hagen undertake to work something out directly with Hickenbottom. According to the granddaughter, at a meeting on September 4, 1989, Hickenbottom promised the granddaughter and Maureen Hagen that she would not move the decedent until there had been further discussion with grandson, but on the following day Hickenbottom broke her promise and moved the decedent without further consultation with the grandson.

The grandchildren and Maureen Hagen consistently acknowledged that none of them was in a position to care for the decedent, but that Hickenbottom was both willing and apparently able to do so. The granddaughter was attending a university in Arizona; Maureen Hagen testified that "[m]y children were too young to take over the care of [the decedent], and I was the divorced wife of her son"; the grandson testified that "I knew my grandmother was taken care of." Maureen Hagen ultimately acknowledged that the only relative "willing to step forward and provide care for [the decedent] so she wouldn't have to go into a nursing home" was Hickenbottom.

The grandchildren and Maureen Hagen also acknowledged that they consciously chose not to challenge the trust or the pour-over will, or to pursue the possibility that the decedent had been moved to, or was being held in, Santa Cruz against her will, during the decedent's lifetime. They variously explained that they considered it futile to attempt to break Hickenbottom's influence and that they were satisfied that the decedent was being cared for; the grandson went so far as to say that "I didn't want to involve myself," because "it's too hard of an issue. It's just—I have to look out for myself sometimes."

The grandchildren and Maureen Hagen also acknowledged that although the move from Santa Barbara to Santa Cruz had made it less convenient for them to visit with the decedent, their ability to visit, or to talk with the decedent by telephone, was not otherwise impeded.

This was Hickenbottom's showing in support of her motion for summary judgment or summary adjudication. The grandchildren's response is not relevant to our analysis.

The trial court ruled on various of Hickenbottom's grounds, but ultimately based its order granting summary judgment against the grandson on Hickenbottom's asserted "defense of truth," explaining its decision as follows:

"[The grandchildren] allege that [Hickenbottom] made statements to [the decedent] about them with the result that [the decedent] disinherited them. . . . [Hickenbottom] admits having made statements to [the decedent] about the [grandchildren], but asserts that everything [Hickenbottom] told [the decedent] about the [grandchildren] was true. . . . [U]nder the First Amendment to the U.S. Constitution, true statements are absolutely privileged and cannot serve as the basis for liability. [Hickenbottom] having stated a complete defense to all causes of action, the burden shifts to the [grandchildren] to show that a triable issue of fact exists, to wit: that [Hickenbottom] told something to [the decedent] about the [grandchildren] which was not true, or engaged in other wrongful conduct with the result that [the decedent] disinherited the [grandchildren]. [The grandchildren] have not shown a triable issue of fact exists to dispute that what [Hickenbottom] told [the decedent] was true or specified any other wrongful conduct. [¶] The court grants summary judgment as to all causes of action based upon the defense of truth."

On appeal the grandson argues:

(1) That the grandchildren had made a sufficient showing of undue influence;

(2) That Hickenbottom had not made a sufficient showing of an affirmative "defense of truth," or that the grandchildren could not prove "wrongdoing" on Hickenbottom's part; and

(3) That the trial court's ruling must in any event be reversed because the court failed to refer specifically to evidence. (Cf. Code Civ. Proc., § 437c, subd. (g).)

■ Once a summary judgment or summary adjudication is before us, for independent review, on appeal, the trial court's asserted failure to refer to the evidence is not dispositive. (Cf., e.g., *Goldrich* v. *Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 782 [31 Cal.Rptr.2d 162]; *Ruoff* v. *Harbor Creek Community Assn.* (1992) 10 Cal.App.4th 1624, 1627-1628 [13 Cal.Rptr.2d 755].) We shall agree with the grandson that Hickenbottom's showing in support of her motion for summary judgment was insufficient. Thus we need not reach the grandson's contention that undue influence was sufficiently shown, because for purposes of Hickenbottom's summary judgment motion the burden of making such a showing was never imposed on the grandchildren.

As described in Hickenbottom's moving papers in the trial court, her "defense of truth" was that "[a]ll three causes of action are based on statements allegedly made by [Hickenbottom] to [the decedent]. As all statements were either truth or opinion which contains no provably false factual assertion, none of the statements are actionable. Thus, [Hickenbottom] is entitled to judgment on all causes of action." In oral argument to the trial court Hickenbottom took the position that she had established the legal validity and prima facie factual applicability of this theory of defense; that therefore the grandchildren, to raise a triable issue of material fact and thus to avoid summary judgment, were required to show *either* that one or more of the statements were *false or* that one or more of the grandchildren's theories were based on something *other* than Hickenbottom's statements to the decedent; and that the grandchildren had failed to make either showing. The trial court adopted Hickenbottom's argument. By her initial and supplemental briefing to this court, Hickenbottom has further refined her argument: She now asserts that in support of her motion for summary judgment she had sufficiently shown *both* an "affirmative defense of truth" *and* (in light of *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573 [37 Cal.Rptr.2d 653]) that the grandchildren had "offered no evidence whatsoever that [Hickenbottom] did or said anything wrong," and therefore that the grandchildren had been obliged not only to raise a triable issue of fact material to the "affirmative defense of truth" but also to set forth facts to support their first amended complaint. The grandson has responded to Hickenbottom's assertions, as so refined, on their merits, and thus may be deemed to have waived any objection that the refinements are untimely. (Cf. *Juge* v. *County of Sacramento* (1993) 12 Cal.App.4th 59, 68 [15 Cal.Rptr.2d 598].)

On the record before us we conclude that Hickenbottom neither demonstrated the legal validity of a complete affirmative "defense of truth" in this case nor made a showing sufficient, under the amended summary judgment statute as construed in cases such as *Union Bank*, to require the grandchildren, as plaintiffs, to put on a prima facie factual case at the summary judgment stage. Thus summary judgment should not have been granted, and cannot be supported, on either of these grounds. No other basis for summary judgment has been raised or argued in this court.

### 1. *Defense of Truth*

In this court Hickenbottom reduces the essence of her "defense of truth" to a single sentence: "True statements are absolutely privileged and cannot form the basis for liability, regardless of the name put on the legal theory or how the claim is labeled." She does not explicitly rely, as she did in her moving papers in the trial court, on constitutional safeguards of

freedom of speech. To support her "defense of truth" she cites only *Francis v. Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535 [4 Cal.Rptr.2d 361].

*Francis* does not warrant so broad a generalization.

*Francis* is one of several California cases that have explicitly or implicitly acknowledged the proposition that principles applicable to actions for defamation will apply, more broadly, "whenever the gravamen of the claim is injurious falsehood." (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1045 [232 Cal.Rptr. 542, 728 P.2d 1177]; cf. *Morningstar, Inc.* v. *Superior Court* (1994) 23 Cal.App.4th 676, 696 [29 Cal.Rptr.2d 547]; cf. also *Paradise Hills Associates* v. *Procel* (1991) 235 Cal.App.3d 1528, 1542 [1 Cal.Rptr.2d 514]; *Hofmann Co.* v. *E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 402 [248 Cal.Rptr. 384]; *Jennings* v. *Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119, 129 [210 Cal.Rptr. 485].) In *Francis* the plaintiff had based claims for defamation, interference with prospective economic advantage, "injurious falsehood," and intentional infliction of emotional distress upon publication of a single credit report. Having concluded that the credit report was true and therefore not defamatory, the Court of Appeal also rejected the plaintiff's alternative theories, commenting that "[i]f a statement is protected, either because it is true or because it is privileged, that ' "protection does not depend on the label given the cause of action." ' . . . [¶] . . . In California, truth is a complete defense to a defamation action regardless of the malice or ill will of the publisher. . . . We cannot believe this defense can be abrogated merely because an artful pleader chooses to label the cause of action [by a name other] than defamation." (3 Cal.App.4th at p. 540.)

*Francis*'s conclusions cannot be considered controversial. Falsity was an element of a civil action for defamation, and thus truth could be said to be a "complete defense" to defamation, at common law (2 Harper et al., Law of Torts (2d ed. 1986) §§ 5.0, 5.20, pp. 3, 158 et seq.), and the California statutes explicitly preserve the requirement that a defamatory publication be "false." (Civ. Code, §§ 44, 45, 46.) To say that an action of which the gravamen is an allegation of injurious falsehood, and which is thus indistinguishable in substance from defamation (cf. *Blatty* v. *New York Times Co.*, *supra*, 42 Cal.3d at p. 1042), should be subject to the same rules is simply to acknowledge that substance should be more significant than form.

■ But obviously these rules, born of the common law of defamation and applicable to actions analogous to defamation, do not compel a conclusion that liability can never attach to a true statement, regardless of the circumstances in which the statement is made or the theory upon which recovery is sought.

Nor would the First Amendment support the unqualified "absolute privilege" for true statements, against state action in the form of judicially supervised civil recovery, that Hickenbottom advocates. "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances." (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 571 [86 L.Ed. 1031, 1035, 62 S.Ct. 766]; cf. *Konigsberg* v. *State Bar* (1961) 366 U.S. 36, 49 [6 L.Ed.2d 105, 115-116, 81 S.Ct. 997]; *People* v. *Luros* (1971) 4 Cal.3d 84, 92 [92 Cal.Rptr. 833, 480 P.2d 633].) Thus, for example, "liability may exist for tortious speech" notwithstanding the First Amendment. (*Michael R.* v. *Jeffrey B.* (1984) 158 Cal.App.3d 1059, 1070 [205 Cal.Rptr. 312]; see *Bill* v. *Superior Court* (1982) 137 Cal.App.3d 1002, 1009 [187 Cal.Rptr. 625]; cf. also *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 48 [123 Cal.Rptr. 468, 539 P.2d 36] ["The First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act"].) "If the speech is meant to, and does, offend the law, utterance of the words themselves may be protected; but the speaker is subject to the consequences. This state's version of the First Amendment, which is even more liberally construed . . . , says just that: 'Every person may freely speak, write and publish his or her sentiments on all subjects, *being responsible for the abuse of this right.* A law may not restrain or abridge liberty of speech or press.' (Cal. Const., art. I, § 2, subd. (a), italics added.)" (*Long* v. *Valentino* (1989) 216 Cal.App.3d 1287, 1297 [265 Cal.Rptr. 96].)

■ Patently the grandchildren's undue influence theories did not have as their gravamen "the alleged injurious falsehood of a statement," either in the abstract or as the grandchildren pleaded the theories in their first amended complaint. (*Blatty* v. *New York Times Co.*, *supra*, 42 Cal.3d at p. 1045.)

■ In the context of disposition of property at death, the definition of undue influence is strongly influenced by the presumption, developed in the context of wills, that a testator was competent to make a valid will. (Cf., e.g., *Estate of Fritschi* (1963) 60 Cal.2d 367, 372-373 [33 Cal.Rptr. 264, 384 P.2d 656]; *Estate of Lingenfelter* (1952) 38 Cal.2d 571, 580 [241 P.2d 990]; *Estate of Smith* (1926) 200 Cal. 152, 158 [252 P. 325]; *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604 [270 Cal.Rptr. 560]; *Estate of Goetz* (1967) 253 Cal.App.2d 107, 112-113 [61 Cal.Rptr. 181].) "As a general proposition, California law allows a testator to dispose of property as he or she sees fit without regard to whether the dispositions specified are appropriate or fair. [Citations.] Testamentary competence is presumed. [Citations.]" (*Estate of Sarabia*, *supra*, 221 Cal.App.3d at p. 604.) ■ The presumption can be overcome if it is shown that the testamentary act was the product of undue

influence (*ibid.*), but the strictness of the rules for proof of undue influence reflects the strength of the presumption in favor of the will: " '[I]t is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. [Citation.] Evidence must be produced that pressure was brought to bear directly upon the testamentary act. [Citation.] Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator. [Citation.] . . . . [M]ere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. [Citation.] [¶] "The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.' " [Citation.]' " (*Estate of Welch* (1954) 43 Cal.2d 173, 175-176 [272 P.2d 512], quoting from *Estate of Arnold* (1940) 16 Cal.2d 573, 577 [107 P.2d 25].) " 'Before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be inconsistent with voluntary action on the part of the testator.' " (*Estate of Lombardi* (1954) 128 Cal.App.2d 606, 613 [276 P.2d 67], quoting from *Estate of Llewellyn* (1948) 83 Cal.App.2d 534, 566 [189 P.2d 822].)

■ These principles are manifestly as applicable to an estate plan formalized by simultaneously executed inter vivos trust and pour-over will as to a will alone. It is also clear that the concept of undue influence, in this context, focuses inquiry on whether the influencer has successfully undertaken to "[overpower] the mind and [bear] down the volition" of the trustor/testator at the time the estate plan was formalized, rather than (for example) on whether particular words assertedly used to that end were true or false. It is plausible, for example, that an influencer's declaration that the trustor/testator's issue "do not need your money as much as I do" might be demonstrably true but might nevertheless, through repetition, emphasis, or combination with other forms of persuasion and in light of the trustor/testator's particular susceptibilities, amount or at least significantly contribute to "*coercion* destroying free agency on the part of the [trustor/]testator." Examples of undue influence effected at least in part by true statements are understandably rare in the reported cases, but California courts have recognized that "a person's will may be overborne without misrepresentation" (*Odorizzi* v. *Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 130 [54 Cal.Rptr. 533]) and that "[i]t is all one whether [the influencer's assertions] were true or false, so long as respondent was influenced by them" to take the action the influencer sought. (*Rottman* v. *Rottman* (1921) 55 Cal.App. 624, 633 [204 P. 46].)

Obviously, on the other hand, at least as a practical matter a disappointed potential beneficiary's case for undue influence would be substantially stronger if it could be shown that the influencer's statements were in fact false. But in this case the grandchildren did not plead, and indeed have never asserted, that anything Hickenbottom told the decedent was false.

Thus *Francis*, and related cases, are inapposite. If, as the grandchildren have asserted, Hickenbottom unduly influenced the decedent by means (at least in part) of statements Hickenbottom made to the decedent for that purpose, then the fact those statements were true would not be a defense, in and of itself, to theories of relief based on the asserted undue influence. Because truth would not be a complete defense in any event, we need not consider whether Hickenbottom's factual showing was sufficient to demonstrate that her statements were true.

### 2. *Elements of Cause of Action*

Hickenbottom has suggested no other "complete defense" to the grandchildren's claims. (Code Civ. Proc., § 437c, former subd. (n)(2); Stats. 1992, ch. 1348, § 1.) ■■■ Instead, she argues that her showing was in any event sufficient to shift to the grandchildren the burden of making a prima facie factual case in support of their first amended complaint, and that the grandchildren have not borne that burden.

Until the summary judgment statute was amended, in 1992 and 1993, to add definitions of the burdens of moving and responding parties on motions for summary judgment or summary adjudication (Stats. 1992, ch. 1348, § 1, adding a new subd. (n) to Code Civ. Proc., § 437c) and then to redesignate and augment those definitions (Stats. 1993, ch. 276, § 1, redesignated subd. (n) as subd. (o)), the judicially declared burden upon a moving defendant who did not establish a complete defense was to "conclusively negate a necessary element of the plaintiff's case." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]; *Vanderbilt Growth Fund, Inc.* v. *Superior Court* (1980) 105 Cal.App.3d 628, 633-634 [164 Cal.Rptr. 621].)

The 1992 amendment to the summary judgment statute provided in pertinent substance that a defendant who did not establish a complete defense would nevertheless have met his or her initial burden of showing the plaintiff's action had no merit if he or she had "shown that one or more elements of the cause of action . . . cannot be established." (Code Civ. Proc., § 437c, former subd. (n)(2), Stats. 1992, ch. 1348, § 1.) The 1993 amendment did not alter this language. There was initial debate as to

whether the new statutory requirement of a showing that an element "cannot be established" effected any significant change from the preexisting requirement that the defendant "conclusively negate" the element. (Compare, e.g., Hatchimonji, *Considering the Summary View of the Recent Change in Summary Judgment Law* (Mar. 1994) CTLA Forum 11, 13, with Schmalz, *Summary Judgment: A Dress Rehearsal for Trial* (Sept. 1993) 16 L.A. Lawyer 23.) There is evidence that the 1992 and 1993 amendments were in some respects influenced by the decision of the United States Supreme Court in *Celotex Corp.* v. *Catrett* (1986) 477 U.S. 317 [91 L.Ed.2d 265, 106 S.Ct. 2548], and those who support the view that the amendments have substantially lessened a moving defendant's burden sometimes point to *Celotex*'s statement that, under the federal summary judgment rule, where at trial the nonmoving party would have the burden of proving the element in issue "the burden on the moving party may be discharged by 'showing'—*that is, pointing out to the district court*—that there is an absence of evidence to support the nonmoving party's case." (477 U.S. at p. 325 [91 L.Ed.2d at p. 275], italics added; cf., e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial 3 (The Rutter Group 1995) § 10:243, p. 10-70; cf. also *Biljac Associates* v. *First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1421 [267 Cal.Rptr. 819] [concluding, before the 1992 and 1993 amendments, that *Celotex*'s statement "is incompatible with California law . . ."].)

Early this year, the effect of the 1992 and 1993 amendments on a moving defendant's burden was directly addressed in *Union Bank* v. *Superior Court, supra,* 31 Cal.App.4th 573. The Court of Appeal concluded that "[t]he fact that the Legislature chose not to utilize the term 'negate' reflects an intention to change the long-standing duty of a moving defendant" (31 Cal.App.4th at pp. 586-587, fn. 8), but expressly declined to decide whether the Legislature had "intended to adopt the *Celotex Corp.* test" (*ibid.*) and carefully limited itself to an assessment of the effect of the amendments on the rule of its own earlier decision, in *Barnes* v. *Blue Haven Pools* (1969) 1 Cal.App.3d 123 [81 Cal.Rptr. 444], that (as restated in *Union Bank*) ". . . a moving defendant cannot secure summary judgment merely by relying on a plaintiff's discovery responses which reveal an absence of evidence of liability or damage." (31 Cal.App.4th at p. 581.)

In *Union Bank* the plaintiffs' theory of recovery was, in pertinent part, that Union Bank had "participated in" a fraud on the plaintiffs involving repossession of personal property which the plaintiffs' limited partnership had leased; the lessor had assigned repossession rights under the lease to Union Bank as security for a loan to the lessor. Union Bank propounded requests for admissions by the plaintiffs that (among other things) Union Bank (1) " 'took no inappropriate action in connection with its role in the transactions,' " (2) had committed no fraud or deceit on the plaintiffs and (3) had

participated in no fraudulent conspiracy, and backed up the requests with form interrogatories which required that, for any response which was not an unqualified admission, the plaintiffs should " 'state all facts upon which you base your response . . . .' " (31 Cal.App.4th at pp. 578-579.) The plaintiffs made the first requested admission but refused to make the second or third; in response to the state-all-facts interrogatories the plaintiffs stated, with respect to the second and third requests, only that they " 'believe that Union Bank knowingly and fraudulently took the assignment of all the assets of [the limited partnership] to secure the loan it made with [the lessor]' " and that they " 'reserve the right to further respond to this interrogatory.' " (*Id.* at p. 578.) Union Bank made these discovery responses the basis for a motion for a defense summary judgment; the question pertinent to the issue before us was whether this showing was sufficient, under the 1992 and 1993 amendments, to shift the burden to the plaintiffs in the summary judgment proceedings.

The Court of Appeal concluded that the 1992 and 1993 amendments had legislatively overruled *Barnes* v. *Blue Haven Pools* insofar as that case "prohibited a summary judgment motion from being granted when a moving defendant merely relies on a plaintiff's factually devoid interrogatory answers" (*Union Bank* v. *Superior Court, supra,* 31 Cal.App.4th at p. 589), and that in the case before it the plaintiffs' "interrogatory answers, which contained no facts supporting the existence of misrepresentations or a fraudulent conspiracy, shifted the burden of proof in connection with the summary judgment." (*Id.* at p. 581.)

In this court, Hickenbottom argues on the basis of *Union Bank* that she "has made an adequate 'showing' . . . that [the grandson] has offered no evidence whatsoever that [Hickenbottom] did or said anything wrong. The *Union Bank* case now confirms what [Hickenbottom] has maintained throughout her opposition, namely that she is not required to prove the absence of material facts. Rather, her burden, which she has fully met, is simply to set forth her affirmative defense of truth and point out to the court that no material facts have been presented by [the grandson]."

We note preliminarily that in this case we deal only with the 1992 amendments to the summary judgment statute and not with the 1993 amendments which *Union Bank* also discussed: the motion in this case was made, heard, and ruled on before the effective date of the 1993 amendments. Much of the legislative history on which the Court of Appeal relied in *Union Bank* related to the 1993 amendments, and the relevance of its reasoning to the case before us is accordingly diluted.

Nevertheless we would have no quarrel, under the 1992 amendments, with the result *Union Bank* reached with respect to the sufficiency of the moving defendant's showing to shift the burden for purposes of summary judgment.

■ We cannot agree with those who may be understood to suggest that a moving defendant may shift the burden simply by suggesting the possibility that the plaintiff cannot prove its case. It is clear to us, from the requirement of the 1992 amendment that a defendant have "shown that one or more elements of the cause of action . . . cannot be established" (Code Civ. Proc., § 437c, former subd. (n)(2); Stats. 1992, ch. 1348, § 1), that a defendant must make an affirmative *showing* in support of his or her motion. Such a showing connotes something significantly more than simply "pointing out to the . . . court" that "there is an absence of evidence": before the burden of producing even a prima facie case should be shifted to the plaintiff in advance of trial, a defendant who cannot negate an element of the plaintiff's case should be required to produce direct or circumstantial evidence that the plaintiff not only does not have but cannot reasonably expect to obtain a prima facie case. But where such a showing can be made we consider it both fair to the defendant and consistent with efficient administration of justice that the plaintiff be called upon, on risk of summary judgment, to make a prima facie case.

The circumstances of *Union Bank*, as we understand them, appear to have met these criteria. Using well-established discovery tactics, Union Bank requested admissions and, by written interrogatories, called upon the plaintiffs to substantiate any refusal to admit by stating *all facts* on which the refusal was based. The plaintiffs presumably had no less than the full 30 days provided by statute (Code Civ. Proc., § 2030, subd. (h)) in which to file written responses to these interrogatories, a period which should have been ample to permit a response "as complete and straightforward as the information reasonably available to the responding party permits" as required by the discovery act. (*Id.* subd. (f)(1); cf. *Union Bank* v. *Superior Court, supra*, 31 Cal.App.4th at p. 580, fn. 3.) The plaintiffs' answers to Union Bank's interrogatories reflected no more than the plaintiffs' conclusionary *belief* that Union Bank had acted "knowingly and fraudulently"; such answers strongly supported an inference that the plaintiffs had no *facts* to support their theory. The plaintiffs might have sought relief from the difficulties in which these answers placed them by various methods. They might, for example, have followed up, under subdivision (m) of Code of Civil Procedure section 2030, on their implied proposal to submit further answers. Or, in the summary judgment proceedings themselves, the plaintiffs might have sought, under subdivision (h) of Code of Civil Procedure section 437c, either a denial of the motion or a continuance for further investigation or discovery. The plaintiffs did neither. In all these circumstances the Court of Appeal was justified in its implicit conclusion that Union Bank had sufficiently borne its initial burden of showing "that one or more elements of the cause of action . . . cannot be established . . . ."

The *Union Bank* court subsequently made clear that not every discovery response which does not further the adversary's case will suffice in and of itself to show that the case "cannot be established": In *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733 [41 Cal.Rptr.2d 719], an individual plaintiff sought recovery on a theory of civil conspiracy. At deposition, the plaintiff acknowledged that he was personally unaware of any significant communication between the alleged coconspirators. The Court of Appeal, pointing out that there was no basis on which to suppose the plaintiff would have been present to observe such a communication, concluded that the plaintiff's deposition responses were insufficient by themselves to shift the burden. (35 Cal.App.4th at pp. 739-740, 748.) In this respect *Villa*, like *Union Bank*, reached a result consistent with our perception of the effect of the 1992 amendments to the summary judgment statute. On the other hand we would respectfully question the conclusion of another Court of Appeal, in an even more recent case, that "factually vague" deposition responses by the plaintiff himself sufficed, in the circumstances of that case, to shift the burden to the plaintiff. (*Hunter* v. *Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282, 1288 [44 Cal.Rptr.2d 335].)

 Applying the criteria we have enumerated to the record before us, we conclude that Hickenbottom did not make a showing that the grandchildren's case "cannot be established" sufficient to shift the burden to the grandchildren in the summary judgment proceedings. Any arguable inability the individual plaintiffs might have experienced, at deposition, to provide direct evidence of undue influence would have been explicable, here as in *Villa*, inasmuch as the plaintiffs almost certainly would not have been present. In this light it is notable, given the probability that Hickenbottom is the only surviving percipient witness to much of what she did or did not do to influence the decedent's estate-planning decisions, that Hickenbottom submitted no declaration of her own. The difficulties of proof of undue influence in circumstances such as these are taken into account in the rule that certain foundational facts will activate a *presumption* of undue influence which, at trial, would operate to shift the burden of proof to the proponent of the trust or will. (Cf. *Estate of Sarabia*, *supra*, 221 Cal.App.3d at p. 605.) But Hickenbottom did not appear to attempt to negate these foundational facts or to show that the foundational facts could not be established. And Hickenbottom, like the defendant in *Villa*, for whatever reason apparently did not employ discovery tactics—such as legitimately founded state-all-facts interrogatories—more likely in these circumstances to lead to a well-founded conclusion that the grandchildren could not establish their case.

Our conclusion that Hickenbottom's showing was insufficient should not be understood to imply that the grandson's case is necessarily meritorious.

Indeed the record before us suggests that his prospects of ultimately proving undue influence are slight. But while it also serves the efficient administration of justice to remove a palpably weak case from the system as soon as possible, on a motion for summary judgment we are bound by the statute to distinguish between a case which is simply weak and a case which "cannot be established." We hold no more than that Hickenbottom has not sufficiently shown, in support of this summary judgment motion, that the grandson's case *cannot* be established.

Nor do we take any position as to the several rulings on other aspects of Hickenbottom's motion which the parties have chosen not to place before us. We hold only that because Hickenbottom did not bear her statutory burden of proving either a complete defense or that the grandson could not establish his cause of action, the burden never shifted to the grandson in the summary judgment proceedings and the trial court should have denied the motion for summary judgment.

Hickenbottom's motion for sanctions on appeal is denied. The judgment entered May 17, 1994, is reversed as to plaintiff Michael John Hagen only. The matter is remanded to the superior court with directions that the court (1) vacate so much of its order entered October 5, 1993, as grants summary judgment against plaintiff Michael John Hagen "as to all causes of action based upon the defense of truth," and (2) modify the October 5, 1993, order insofar as necessary to deny summary judgment as to Michael John Hagen. Michael John Hagen shall recover his costs on appeal.

Cottle, P. J., and Wunderlich, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 20, 1996.