Filed 2/21/14  Estate of Isenberg CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| Estate of LOREE ISENBERG, Deceased. | |
| TONI L. KITCHEN, as Special Administrator, etc., | E052086 |
| Petitioner and Appellant, | (Super.Ct.No. RIP088494) |
| v. | O P I N I O N |
| KENNETH E. FOXFORD et al., | |
| Objectors and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Stephen D. Cunnison, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Law Offices of Karl D. Mowery and Karl D. Mowery for Petitioner and Appellant.

Horspool & Horspool and Karin E. Horspool for Objectors and Respondents.

1

## I. INTRODUCTION

Appellant Toni L. Kitchen challenged the validity of the last will and testament of her mother, Loree Isenberg, on the grounds Isenberg's signature on the April 12, 2002, will was forged and, alternatively, the will was procured by means of undue influence and fraud on the part of Isenberg's oldest daughter, Deborah L. Collis (Debbie). The will disinherited five of Isenberg's six adult children, including Kitchen, and left Isenberg's entire estate in equal shares to her brother, respondent Kenneth E. Foxford, and Debbie.

When Isenberg died on June 18, 2003, her principal asset was her interest in a $4.2 million personal injury judgment which was on appeal. The judgment was affirmed on appeal in June 2004, and Debbie died in September 2004. A probate was not opened for the will. In 2005, Kitchen filed the present petition seeking to invalidate the will and transfer Isenberg's personal injury award and other assets to Kitchen on behalf of herself and Isenberg's other intestate heirs. (Prob. Code, § 850.)

After hearing evidence over six court days in May 2010, the trial court granted respondents' motion for judgment and issued a statement of decision (Code Civ. Proc., § 631.8),[1] discrediting much of Kitchen's evidence and concluding she failed to present sufficient evidence to support her claims. Judgment was entered in favor of respondents and the proponents of the will, Kenneth E. Foxford and William Collis, Jr., the administrator of Debbie's estate.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

On this appeal, Kitchen claims the trial court violated section 631.8 and denied her due process in granting the motion for judgment without first reviewing and considering three items of evidence: (1) a "day-in-the-life" videotape showing Isenberg at home and in excruciating pain in May 2002; (2) Isenberg's videotaped deposition, taken in her personal injury action in July 2002, showing her in poor health and having difficulties with her memory; and (3) the deposition transcript of Isenberg's longtime friend, Mary Nelson, taken in 2009 and attesting to Isenberg's abiding love for all of her children and grandchildren, and her intent to share her personal injury award with all of them.

We affirm. The contents of the allegedly disregarded evidence, which was brought to the court's attention before the court ruled on the motion, was largely cumulative to the testimony of other witnesses, and was referred to by other witnesses and counsel. In addition, the court credited the entire testimony of Isenberg's personal injury attorney, Steven Carlson, who testified he prepared the will and discussed it at length with Isenberg both before and at the time she signed it on April 12, 2002, at Kaiser Hospital in Riverside in the presence of Carlson, another witness, and a notary public. According to Carlson, Debbie was not present when the will was signed, and Isenberg had reasons for disinheriting five of her children, and she did not want her will discussed with them.

The court concluded that even though Isenberg was susceptible to undue influence when she signed the will, the will was not the product of undue influence or fraud. We therefore conclude that to the extent the court may have failed to view the day-in-the-life

3

videotape and deposition testimony, it is not reasonably probable Kitchen would have realized a more favorable result had the court considered the evidence in detail. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

## II. BACKGROUND

A. *Isenberg's Accident, Medical Condition, and Family Relationships*

Isenberg died on June 18, 2003, at the age of 67. At the time she signed her will on April 12, 2002, Isenberg was unmarried and had six adult children: Debbie, Mary K. Winkler (Kathy), Anthony Winkler, Jr. (Anthony), Jeffrey E. Winkler, Cynthia Babb, and Kitchen. Kathy died in February 2003, predeceasing Isenberg. As noted, Debbie died in September 2004.

On July 10, 2001, two years before her death, Isenberg suffered personal injuries, including blunt force trauma to the chest, when a car she was riding in was struck head-on by an Anheuser-Busch beer truck. The driver of the car was killed, and Isenberg sued Anheuser-Busch, Inc. for her injuries. Isenberg was in poor health even before the accident: her pre-existing conditions included chronic obstructive pulmonary disease, congestive heart failure, heart bypass surgery, insulin-dependent diabetes, and brain atrophy. She was hospitalized for three days following the accident, then discharged to her home, but her condition quickly worsened.

In August 2001, a tracheotomy was performed to allow Isenberg to breathe through a ventilator, and she remained ventilator-dependent until February 2002. Thereafter, she was periodically placed back on the ventilator and readmitted to various

hospitals and a subacute care facility in Pomona known as Sunbridge. At home, she required 24-hour nursing care and a respiratory therapist.

Around February 2002, Debbie arranged for Isenberg to rent a trailer in Hemet, a short walk from Debbie's trailer. Debbie spent many hours with Isenberg, both in Isenberg's trailer and when Isenberg was in the hospital and care facility, acting as Isenberg's self-appointed "gatekeeper." Several of Isenberg's other adult children and her initial respiratory therapist, Dan Blair, testified Isenberg was fearful of Debbie, did not trust Debbie, and did not want Debbie in charge of or making decisions concerning her estate. According to Babb, Debbie was always telling Isenberg about Debbie's "problems and [her] divorce," and this was stressful to Isenberg. According to Anthony, Debbie falsely told him she had a power of attorney for Isenberg, and the family had problems with Debbie being "dishonest and manipulative."

Additional testimony revealed that Debbie never interfered with Isenberg's caretakers, never threatened to withhold food or medicine from Isenberg, and never prevented Isenberg's other children from visiting her outside Debbie's presence. According to Blair, Debbie only wanted to know what was going on with Isenberg, and Isenberg mistrusted and was frustrated with her entire family. Isenberg once told Blair she wanted to leave her estate to him, and complained that her children never used to visit her but had been "around her consistently" since her accident. All of Isenberg's adult children who testified claimed they often visited Isenberg and had a good relationship with her. An expert witness testified Isenberg was susceptible to undue influence, and

5

relied in part on Nelson's 2009 deposition testimony that Isenberg loved all of her children and grandchildren and wanted to share her personal injury award with all of them.

Kitchen testified that before the will was signed, Debbie told Kitchen that Debbie believed Isenberg wanted to establish a trust fund for her grandchildren. Kitchen and Debbie agreed Isenberg tended to favor the last child who visited her. According to Kitchen, Debbie was "shocked" to learn that Foxford inherited half of Isenberg's estate. Foxford did not know he was a beneficiary of the will until after Isenberg died. Foxford also testified there was "lots of turmoil" in Isenberg's relationships with her children. Prior to the accident, Isenberg would be unhappy with one child one week and another child the next.

B. *Carlson's Testimony and the Circumstances Surrounding the Will*

Carlson prepared the will which Isenberg signed on April 12, 2002, in her room at Kaiser Hospital in Riverside. On three or four occasions after February 2002, when she was not on a ventilator, Isenberg told Carlson she wanted a will and wanted "Kenny [and] Debbie" to inherit her estate. Carlson and a hospital security guard, Tim Bassin, who also testified at trial, witnessed Isenberg sign the will and signed the will as witnesses. A notary public also testified that she verified Isenberg's identity and witnessed her signature. No one else was present when Isenberg signed the will. Carlson and Isenberg planned on signing the will during the late morning when none of Isenberg's children, including Debbie, would be present.

6

Carlson read the will to Isenberg before she signed it, and Isenberg read the will herself. Isenberg's memory was good at the time; Carlson believed she had testamentary capacity; and she never asked Carlson to change the will. According to Carlson, Isenberg had problems with her children and reasons for disinheriting them; some owed her money; some had stolen from her; and some had had no contact with her. The children's testimony showed Isenberg's beliefs were more or less true. For example, Anthony still owed Isenberg money. Isenberg instructed Carlson not to tell anyone about the will because it would cause conflicts in the family.

According to Carlson, Debbie was difficult and demanding on behalf of Isenberg; Debbie called Carlson's office almost daily, but she was not a "bully." Isenberg was a "nice lady," but also tough, strong-willed, and demanding. Preparing wills was "[a]bsolutely not" part of Carlson's law practice. Carlson had no notes concerning his drafting of the will.

Around September 2001, when Carlson and his law partner Randy Johnson were first hired to represent Isenberg in her personal injury action, Isenberg had recently been in a coma and Johnson had another attorney draft conservatorship documents for Isenberg. But Isenberg later "came around" and was "doing a lot better," and made it clear she did not want a conservator.

C. *Isenberg's Personal Injury Award and Judgment*

In January 2003, a jury awarded Isenberg $4,256,385 in her personal injury action against Anheuser-Busch, Inc. The award was comprised of $3,026,385 for past and

future medical expenses and $1,230,000 for pain and suffering. Anheuser-Busch, Inc. appealed. After Isenberg died in June 2003, no probate estate was opened for Isenberg. Foxford and Debbie substituted into the personal injury action as Isenberg's successors in interest.

In June 2004, the personal injury judgment was affirmed on appeal.[2] Debbie died in September 2004, survived by her two children, William Collis, Jr. and Nicole Weaver. Respondent William Collis, Jr. is the administrator of Debbie's estate. In her petition, Kitchen alleges Anheuser-Busch, Inc. paid the judgment to Isenberg's personal injury attorneys, Carlson and Johnson. The attorneys, in turn, bypassed opening a probate or intestate estate for Isenberg, bypassed paying any creditors, and distributed $2,366,788.30 to themselves for their attorney fees; $998,121.71 to Foxford, and $973,766.71 to Debbie's estate.

D. *The Motion for Judgment and Statement of Decision*

In her petition and at trial, Kitchen claimed Isenberg's signature on the will was forged and Debbie procured the will by means of undue influence. The petition asserted claims of forgery, lack of due execution, lack of capacity, undue influence, fraud, coercion, duress, menace, negligence, fraud and concealment, conversion, and constructive trust against respondents.

---

[2] *Debbie L. Collis v. Anheuser-Busch, Inc.* (June 7, 2004, E033292) [Fourth Dist., Div. Two; nonpub. opn.].

On the morning of May 26, 2010, near the close of Kitchen's evidence, the court suggested that respondents file a motion for judgment on the ground Kitchen did not present sufficient evidence to support her claims. (§ 638.1.) That same morning, the court admitted the three items of evidence Kitchen claims the court failed to consider before it ruled on the motion shortly after 1:30 p.m. that afternoon: (1) Isenberg's six-minute "day-in-the-life" videotape taken in May 2002, shortly after she signed the will; (2) Isenberg's 40-minute videotaped deposition taken in July 2002; and (3) the 167-page deposition transcript of Nelson taken in 2009.

In granting the motion, the court explained its findings in detail, and recorded its findings in its statement of decision. The court found the will was duly executed and witnessed and there was no evidence it was procured by undue influence, fraud, coercion, duress, or menace. The court credited the testimony of Carlson, the other witness to the will, and the notary public, and discredited the testimony of Kitchen's handwriting expert who testified Isenberg's signature appeared to be forged. The court found Isenberg's signature on the will was genuine.

The court found Kitchen did not establish a prima facie case or presumption of undue influence sufficient to shift the burden to respondents to prove the will was not the result of undue influence. The three elements necessary to establish the presumption had not been met: (1) there was no confidential relationship between Isenberg and either Foxford or Debbie; (2) neither Foxford nor Debbie actively participated in the preparation or execution of the will; and (3) there was no undue benefit to Foxford or

9

Debbie because the disposition, though "somewhat unusual," was "within the realm of reasonableness" and, as such, was insufficient to support a presumption of undue influence. The court also found Isenberg was "susceptible to undue influence," but the "evidence taken as a whole did not establish that the Will was procured as a result of that susceptibility to undue influence . . . ."

## III.  DISCUSSION

A. *Section 631.8 and the Standard of Review*

After a party has completed presenting its evidence in a nonjury trial, other parties may move for a judgment and statement of decision without waiving their right to present defense or rebuttal evidence. (§ 631.8, subd. (a).)[3] The motion claims the party against whom it is made presented insufficient evidence to sustain that party's burden of proof. (*Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1262-1263.) If the motion has merit, it dispenses with the need for the moving party to present evidence. (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549.) As Kitchen emphasizes, the court is required to weigh *all* the evidence submitted by the nonmoving party in ruling on a motion for judgment. (*County of Contra Costa v. Humore, Inc.* (1996) 45 Cal.App.4th 1335, 1344.)

---

[3]  Section 631.8, subdivision (a) provides, in relevant part:  "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision as provided in Sections 632 and 634 . . . ."

10

Because section 631.8 requires the court to "weigh the evidence" in ruling on a motion for judgment, the court may discredit some testimony, credit other testimony, and draw conclusions contrary to expert opinion. (*Roth v. Parker, supra,* 57 Cal.App.4th at p. 550; *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1255.) We apply the substantial evidence standard of review to a judgment entered pursuant to section 631.8. (*Combs v. Skyriver Communications, Inc., supra,* 159 Cal.App.4th at p. 1263.) We review the entire record in the light most favorable to the judgment and draw all reasonable inferences in favor of the party prevailing on the motion. (*Ibid.*) We will not reverse the judgment if substantial evidence supports the trial court's factual findings. (*Roth v. Parker, supra,* at pp. 549-550.)

B. *Undue Influence*

"'As a general proposition, California law allows a testator to dispose of property as he or she sees fit without regard to whether the dispositions specified are appropriate or fair. [Citations.] Testamentary competence is presumed. [Citations.]' [Citation.]" (*Hagen v. Hickenbottom* (1995) 41 Cal.App.4th 168, 181.) But a will is subject to being invalidated and set aside if it was procured as a result of undue influence. (*Rice v. Clark* (2002) 28 Cal.4th 89, 96; *David v. Hermann* (2005) 129 Cal.App.4th 672, 684.) Proof of undue influence overcomes the presumption of testamentary competence. (*Hagen v. Hickenbottom, supra,* at pp. 181-182.)

"Undue influence is pressure brought to bear *directly on* the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying

11

the testator's free agency." (*Rice v. Clark, supra,* 28 Cal.4th at p. 96, italics added; see also *David v. Hermann, supra,* 129 Cal.App.4th at p. 684.) Undue influence is subject to strict rules of proof, reflecting the strength of the presumption in favor of the will or other testamentary instrument and the testator's competence or testamentary capacity:  To prove undue influence, it is must be shown that """"the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. [Citation.]  Evidence must be produced that pressure was brought to bear directly upon the testamentary act.  [Citation.]  Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator.  [Citation.] . . . [M]ere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient.  [Citation.] . . ."""" (*Hagen v. Hickenbottom, supra,* 41 Cal.App.4th at p. 182.)

Undue influence may be proved by circumstantial evidence.  (*David v. Hermann, supra,* 129 Cal.App.4th at p. 684.)  "The proof of undue influence by circumstantial evidence usually requires a showing of a number of factors that, in combination, justify the inference, but which, taken individually and alone, are not sufficient."  (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 132, p. 195.)  Indicia of undue influence include:  "(1)  The provisions of the will were unnatural.  It cut off from any substantial bequests the natural objects of the decedent's bounty; (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and

after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will [the decedent was susceptible to undue influence]; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed." (*Estate of Yale* (1931) 214 Cal. 115, 122; see also *Estate of Ventura* (1963) 217 Cal.App.2d 50, 59-60.)

Ordinarily, the person challenging the will has the burden of proving undue influence. (*David v. Hermann, supra,* 129 Cal.App.4th at p. 684.) But a presumption of undue influence "'arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument.'" (*Ibid*.) When the challenger establishes these three factors, the burden shifts to the proponent of the will or other testamentary instrument to prove by a preponderance of the evidence that the instrument was *not* procured by undue influence. (*Ibid*.)

C. *Analysis*

Kitchen does not claim she presented a prima facie case or sufficient evidence to support a presumption of undue influence, and as indicated the trial court found she did not meet this burden. Instead, she claims the court violated section 631.8 and her due process rights in failing to consider *all* of the evidence of undue influence before ruling

13

on the motion for judgment, specifically: (1) Isenberg's six-minute "day-in-the-life" videotape taken in May 2002; (2) Isenberg's 40-minute videotaped deposition taken in July 2002; and (3) Nelson's deposition testimony. She suggests that, had the court reviewed these items of evidence, it could have found she presented sufficient indicia of undue influence to meet her burden of proof on this claim.

It is unclear whether the court had a DVD player and monitor or similar equipment to view the two DVD's. In any event, it appears the court *may not have* had a chance to view the DVD's or read Nelson's deposition, over the lunch hour, before it granted the motion shortly after 1:30 p.m. on May 26. Kitchen claims the court's failure to consider the three items of evidence admitted earlier during the day requires reversal of the judgment and remand for a new trial. We disagree.

The court's alleged error in disregarding the proffered evidence is identical in effect to the erroneous exclusion of admissible evidence. Such error requires reversal "only if the reviewing court is of the opinion, after examining the entire record, that it is [reasonably] probable that a result more favorable to appellants would have been reached absent the error. [Citation.]" (*Lunghi v. Clark Equipment Co.* (1984) 153 Cal.App.3d 485, 489; see Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; Evid. Code, § 354.)

Assuming the court did not view or consider the three items of evidence before it granted the motion for judgment, the error was harmless to Kitchen. In view of all of the other evidence presented and the trial court's findings, it is not reasonably probable that the court would have concluded that Kitchen presented sufficient indicia of undue

14

influence, or sufficient evidence to support her other claims, including fraud, had the court considered the allegedly disregarded evidence in detail.

The May 2002 day-in-the-life videotape of Isenberg, which was made for purposes of settlement in the personal injury action, shows Isenberg in her home, in excruciating pain, and somewhat dependent on Debbie, but a nurse was tending to Isenberg's needs. In the videotape, Isenberg is not on a ventilator, communicates well with Debbie and the nurse, and appears well aware of what is going on around her.

Isenberg's July 2002 videotaped deposition shows her having difficulty breathing, but not on a ventilator, and having *some* difficulty recalling people, events, and other things. For example, Isenberg at one point referred to "Kathy Collis" but when prompted clarified she meant Debbie Collis. She appeared confused and said she did not know, when asked, what diabetes was, nor did she know whether she took insulin. But she recalled breaking her hip around 1990; having heart surgery in 1999; and that she used to smoke cigarettes "a lot." She recalled she was coming from home and going to her doctor's office in Hemet when the July 2001 accident occurred. She recalled shattering glass and being helped from the car by responders. She lived in Lake Elsinore before the accident but now lived alone in Hemet. She described her present pain and discomforts and recalled she had *seven* (not six) living children. Before the accident, she was on social security disability but could drive herself to the market. In short, the videotaped deposition does not show Isenberg having significant memory lapses or not

15

understanding what was happening around her. She graciously thanked all of the attorneys at the end of the deposition.

In her 2009 deposition, Nelson described how she befriended Isenberg around 1965, shortly after Isenberg's seventh child Sean died in his infancy, and had kept in touch with Isenberg over the years. Nelson described how Isenberg loved all of her children and grandchildren. According to Nelson, *before the accident* Isenberg told Nelson she wanted her youngest child, Kitchen, to inherit her "personal stuff" because she wanted to "make up" to Kitchen for leaving her and the other children's father when Kitchen was very young. After the accident, Isenberg said she wanted to give "the little things" to her granddaughters.

Nelson also testified that Isenberg did not recall her children visiting her after the accident and believed they had not visited her in a long time. Around July 2002, Isenberg was upset because she believed Debbie had lied about the other children not visiting her. Isenberg also told Nelson that Debbie had "stolen" some of her medications and money and she did not trust Debbie. Nelson believed Kitchen was the only child whom Isenberg trusted. Isenberg wanted to purchase a large estate with her personal injury award and have all of her children and grandchildren there. Isenberg "wanted to do for all" of her children and never told Nelson she wanted to disinherit any of her children.

Apart from the day-in-the-life videotape and the two depositions, the trial court heard ample testimony from other witnesses that Isenberg was in poor health and in a fragile mental state around the time she signed the will; that Isenberg loved all of her

16

children and grandchildren; and that Isenberg feared and distrusted Debbie. The court also heard testimony that there was much "turmoil" in Isenberg's family, and Isenberg distrusted all of her children at various points in time. The allegedly disregarded evidence was at best cumulative to this testimony. Furthermore, Kitchen's expert witness, Dr. Robert Sawicky, who opined that Isenberg was susceptible to undue influence, discussed the contents of Nelson's deposition testimony at some length.

It is highly unlikely that the day-in-the-life videotape or the two depositions would have had any effect on the outcome, or would have caused the court to discredit Carlson's testimony and deny the motion for judgment. Carlson's testimony, which the trial court credited in its entirety, effectively sunk Kitchen's case. Because Kitchen has not demonstrated a reasonable probability that the trial court's failure, if any, to review and consider the day-in-the-life videotape, Isenberg's videotaped deposition, or Nelson's deposition testimony before granting the motion for judgment affected the outcome, the judgment must be affirmed.

## IV. DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

J.

We concur:

HOLLENHORST _____

Acting P. J.

RICHLI _____

J.